## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORRIGENT CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>DELL TECHNOLOGIES INC. and DELL INC.,<br><br>                    Defendants. | C.A. No. 22-496 (RGA)<br><br>**JURY TRIAL DEMANDED** |
| CORRIGENT CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>ARISTA NETWORKS, INC.,<br><br>                    Defendant. | C.A. No. 22-497 (RGA)<br><br>**JURY TRIAL DEMANDED** |

## JOINT CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

I.    AGREED-UPON CONSTRUCTIONS ...................................................................... 1

II.   DISPUTED CONSTRUCTIONS ............................................................................. 2

    A.   INTRODUCTION ........................................................................................ 2

        1.   CORRIGENT'S OPENING BRIEF ................................................ 2

        2.   DEFENDANTS' ANSWERING BRIEF .......................................... 2

        3.   CORRIGENT'S REPLY BRIEF ..................................................... 3

III.  BACKGROUND OF THE TECHNOLOGY ........................................................... 3

        1.   CORRIGENT'S OPENING BRIEF ................................................ 3

            A.   THE '369 PATENT ........................................................... 3

            B.   THE '400 PATENT ........................................................... 3

        2.   DEFENDANTS' ANSWERING BRIEF .......................................... 4

            A.   THE '369 PATENT ........................................................... 4

            B.   THE '400 PATENT ........................................................... 5

IV.   LEGAL PRINCIPALS ........................................................................................... 8

        1.   CORRIGENT'S OPENING BRIEF ................................................ 8

V.    CLAIM CONSTRUCTIONS OF THE '369 PATENT ......................................... 9

    A.   "main module" (claims 1, 2, 4, 5, 8, 9, 10, 11, 15, 16, 18, 21, 22, 23) .................. 9

        1.   CORRIGENT'S OPENING BRIEF ...................................... 10

        2.   DEFENDANTS' ANSWERING BRIEF ................................. 11

        3.   CORRIGENT'S REPLY BRIEF ............................................ 13

        4.   DEFENDANTS' SUR-REPLY BRIEF .................................. 14

    B.   "subsidiary module" (claims 1, 2, 3, 5, 8, 9, 10, 11, 12, 15, 16, 17, 21, 22, 23, 24) ............................................................................. 14

        1.   CORRIGENT'S OPENING BRIEF ...................................... 15

        2.   DEFENDANTS' ANSWERING BRIEF ................................. 16

        3.   CORRIGENT'S REPLY BRIEF ............................................ 17

        4.   DEFENDANTS' SUR-REPLY BRIEF .................................. 19

    C.   "backplane" (claims 15, 10, 15, 21) ............................................. 19

        1.   CORRIGENT'S OPENING BRIEF ...................................... 19

        2.   DEFENDANTS' ANSWERING BRIEF ................................. 21

        3.   CORRIGENT'S REPLY BRIEF ............................................ 22

|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 24 |
|  | D. | "idle line / idle trace" (claims 1, 4, 7, 15, 18, 20) ............................................ 24 |  |
|  |  | 1. | CORRIGENT'S OPENING BRIEF ........................................................ 25 |
|  |  | 2. | DEFENDANTS' ANSWERING BRIEF ................................................. 25 |
|  |  | 3. | CORRIGENT'S REPLY BRIEF ........................................................... 27 |
|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 29 |
|  | E. | "a system control processor" (claims 15, 16, 18, 21, 23, 24) .............................. 29 |  |
|  |  | 1. | CORRIGENT'S OPENING BRIEF ........................................................ 30 |
|  |  | 2. | DEFENDANTS' ANSWERING BRIEF ................................................. 30 |
|  |  | 3. | CORRIGENT'S REPLY BRIEF ........................................................... 31 |
|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 32 |
|  | F. | "order of steps" (claims 1, 8, 15, 21) ................................................................ 32 |  |
|  |  | 1. | CORRIGENT'S OPENING BRIEF ........................................................ 32 |
|  |  | 2. | DEFENDANTS' ANSWERING BRIEF ................................................. 35 |
|  |  | 3. | CORRIGENT'S REPLY BRIEF ........................................................... 37 |
|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 38 |
| VI. | CLAIM CONSTRUCTIONS OF THE '400 PATENT ..................................................... 39 |  |  |
|  | A. | "said FDB" (claims 1, 11) ................................................................................... 39 |  |
|  |  | 1. | CORRIGENT'S OPENING BRIEF ........................................................ 39 |
|  |  | 2. | DEFENDANTS' ANSWERING BRIEF ................................................. 40 |
|  |  | 3. | CORRIGENT'S REPLY BRIEF ........................................................... 42 |
|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 46 |
|  | B. | "virtual media access control (MAC) bridge" (claims 8, 11, 18) ........................ 47 |  |
|  |  | 1. | CORRIGENT'S OPENING BRIEF ........................................................ 47 |
|  |  | 2. | DEFENDANTS' ANSWERING BRIEF ................................................. 48 |
|  |  | 3. | CORRIGENT'S REPLY BRIEF ........................................................... 49 |
|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 52 |
|  | C. | "order of steps" (claims 1, 11) ........................................................................... 52 |  |
|  |  | 1. | CORRIGENT'S OPENING BRIEF ........................................................ 53 |
|  |  | 2. | DEFENDANTS' ANSWERING BRIEF ................................................. 54 |
|  |  | 3. | CORRIGENT'S REPLY BRIEF ........................................................... 58 |
|  |  | 4. | DEFENDANTS' SUR-REPLY BRIEF .................................................. 61 |

D. "conveying … said received data packet … to at least said first line card for transmission to said MAC destination address / said ingress line card conveys said data packet … to at least said first line card for transmission to said MAC destination address" (claims 1, 11) ................................................. 63

    1. CORRIGENT'S OPENING BRIEF ........................................ 63

    2. DEFENDANTS' ANSWERING BRIEF .................................. 64

    3. CORRIGENT'S REPLY BRIEF ............................................ 65

    4. DEFENDANTS' SUR-REPLY BRIEF .................................... 65

E. "providing for each of said member line cards a respective forwarding database (FDB)" (claim 1) ...................................................... 66

    1. CORRIGENT'S OPENING BRIEF ........................................ 66

    2. DEFENDANTS' ANSWERING BRIEF .................................. 67

    3. CORRIGENT'S REPLY BRIEF ............................................ 68

    4. DEFENDANTS' SUR-REPLY BRIEF .................................... 68

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                           **Page(s)**

*01 Communique Lab'y, Inc. v. LogMeIn, Inc.,*
  687 F.3d 1292 (Fed. Cir. 2012)........................................................................................69

*In re Abbott Diabetes Care Inc.,*
  696 F.3d 1142 (Fed. Cir. 2012)........................................................................................11

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,*
  616 F.3d 1283 (Fed. Cir. 2010)........................................................................................59

*Altiris, Inc. v. Symantec Corp.,*
  318 F.3d 1363 (Fed. Cir. 2003)..............................................................................8, 33, 56

*Apple Comput., Inc. v. Articulate Sys., Inc.,*
  234 F.3d 14 (Fed. Cir. 2000)............................................................................................29

*Apple Inc. v. Valencell, Inc.,*
  IPR2017-00319, Paper 10 (PTAB June 12, 2017)...........................................................46

*Avago Techs. Gen. IP (Sing.) Pte Ltd. v. Asustek Comput., Inc.,*
  No. 15-CV-04525-EMC, 2016 WL 3029674 (N.D. Cal. May 27, 2016).....................37, 39

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.,*
  512 F.3d 1338 (Fed. Cir. 2008)............................................................................... *passim*

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.,*
  533 F.3d 1362 (Fed. Cir. 2008)........................................................................................53

*Bio-Rad Lab'ys., Inc. v. Int'l Trade Comm'n,*
  998 F.3d 1320 (Fed. Cir. 2021)..................................................................................13, 18

*Blackberry Corp. v. MobileMedia Ideas, LLC,*
  IPR2013-00036, Paper 65 (PTAB Mar. 7, 2014) ............................................................46

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.,*
  813 F. App'x 522 (Fed. Cir. 2020) .......................................................................... *passim*

*Citrix Sys., Inc. v. Workspot, Inc.,*
  No. CV 18-588-LPS, 2020 WL 5634219 (D. Del. Sept. 21, 2020).................................56

*Collabo Innovations, Inc. v. OmniVision Techs., Inc.,*
  2017 WL 3670661 (D. Del. Aug. 25, 2017)................................................43, 44, 45, 48

*Cook Biotech Inc. v. Acell, Inc.,*
  460 F.3d 1365 (Fed. Cir. 2006)........................................................................................25

*Creative Internet Advert. Corp. v. Yahoo! Inc.*,
2008 WL 5061625 (E.D. Tex. Nov. 24, 2008) ............................................................. *passim*

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
412 F.3d 1291 (Fed. Cir. 2005)..................................................................................18, 29

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
672 F.3d 1270 (Fed. Cir. 2012)..................................................................................53

*Gerber Sci. Int'l, Inc. v. Roland DGA Corp.*,
No. 3:06-cv-2024, 2011 WL 2133537 (D. Conn. May 27, 2011) .........................................58

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)..................................................................................8, 30

*Hytera Commc'ns Co. v. Motorola Sols., Inc.*,
841 F. App'x 210 (Fed. Cir. 2021) .............................................................................57, 58

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001). Order ........................................................................8, 33, 55

*IQASR LLC v. Wendt Corp.*,
825 F. App'x 900 (Fed. Cir. 2020) .............................................................................50, 52, 53

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019)..................................................................................49

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)....................................................................................32

*Mantech Env't Corp. v. Hudson Env't Servs., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998)..................................................................................56

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)......................................................................................9

*Maxim Integrated Prods., Inc. v. Silicon Mitus Tech., Inc.*,
No. 17-CV-03507 NC, 2018 WL 4657384 (N.D. Cal. July 3, 2018) .........................37, 38, 39

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
764 F.3d 1392 (Fed. Cir. 2014)..................................................................................37

*Motorola Mobility, Inc. v. Microsoft Corp.*,
2012 WL 12519819 (W.D. Wash. June 4, 2012)......................................................39, 58, 61

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014); 572 U.S. 898 (2014) ..............................................................9, 49

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008)............................................................................16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................8, 13, 39

*Phonometrics, Inc. v. Northern Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998)............................................................................43

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
    948 F.3d 1342 (Fed. Cir. 2020)............................................................................46

*Sequoia Tech., LLC v. Dell, Inc.*,
    66 F.4th 1317 (Fed. Cir. 2023) ............................................................................29

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017)............................................................................46

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987)............................................................................49

*Techno View IP, Inc. v. Oculus VR, LLC*,
    No. CV 17-386-VAC-CJB, 2018 WL 4141032 (D. Del. Aug. 30, 2018) ........................36, 37

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)..............................................................................9

*Toro Co. v. White Consol. Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999)............................................................................31

*Versata Software, Inc. v. SAP Am., Inc.*,
    No. 2:07-CV-153, 2009 WL 1408520 (E.D. Tex. May 19, 2009)........................59

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)................................................................................8

*Whittaker Corp. v. UNR Indus., Inc.*,
    911 F.2d 709 (Fed. Cir. 1990)..............................................................................68

*Wi-LAN USA, Inc. v. Apple Inc.*,
    830 F.3d 1374 (Fed. Cir. 2016)............................................................................26

*Wi-LAN, Inc. v. Apple Inc.*,
    811 F.3d 455 (Fed. Cir. 2016)..........................................................................36, 37

*WSOU Investments LLC v. Dell Techs. Inc.*,
    No. 6:20–cv-00476-ADA, slip. op. (W.D. Tex. May 27, 2021)............................39

*X2Y Attenuators, LLC v. U.S. Int'l Trade Comm'n,*
    757 F.3d 1358 (Fed. Cir. 2014)..............................................................................................21

# TABLE OF EXHIBITS[1]

| Exhibit | Description |
|---------|-------------|
| Ex. 1 | Declaration of Andrew C. Mayo |
| Ex. 1A | Excerpt from the prosecution history for U.S. Patent No. 6,957,369, Response to Office Action, dated February 2, 2005 |
| Ex. 1B | Excerpt from the prosecution history for U.S. Patent No. 6,957,369, Notice of Allowance, dated June 10, 2005 |
| Ex. 1C | *Corrigent Corp. v. Cisco Sys. Inc.*, 6:22-cv-00396-ADA (W.D. Tex.), Dkt. 69 (March 21, 2023) |
| Ex. 1D | *Corrigent Corp. v. Cisco Sys. Inc.*, 6:22-cv-00396-ADA (W.D. Tex.), Dkt. 49 (December 16, 2022). |
| Ex. 2 | Declaration of Dr. James Olivier in Support of Corrigent's Opening Claim Construction Brief, dated January 9, 2024 |
| Ex. 2A | Curriculum Vitae of Dr. James Olivier |
| Ex. 2B | U.S. Patent No. 5,420,985 |
| Ex. 2C | RFC4026, *Provider Provisioned Virtual Private Network (VPN) Terminology*, dated March 2005 |
| Ex. 3 | Declaration of Andrew C. Mayo |
| Ex. 3A | *Dell Technologies Inc. et al v. Corrigent Corporation*, IPR2023-00370, Petition, Paper 1, December 23, 2022 |
| Ex. 3B | *Dell Technologies Inc. et al v. Corrigent Corporation*, IPR2023-00370, Exhibit 1003, Declaration of Dr. Bambos, December 23, 2022 |
| Ex. 3C | *Arista Networks, Inc., v. Corrigent Corporation*, IPR2023-00805, Petition for IPR of the '400 Patent, Paper 2, April 3, 2023 |
| Ex. 3D | *Arista Networks, Inc., v. Corrigent Corporation*, IPR2023-00805, Exhibit 1003, Declaration of Dr. Lavian, April 3, 2023 |
| Ex. 3E | Excerpt of Ramesh Ponnapalli Deposition Transcript taken on October 11, 2023 in *Corrigent Corporation v. Cisco Systems, Inc.*, 6:22-cv-00396 (W.D. Tex.) |
| Ex. 4 | Supplemental Declaration of Dr. James Olivier Regarding Claim Construction, dated February 22, 2024 |

---

[1] Plaintiff's exhibits listed first, followed by Defendants' exhibits.

| Exhibit | Description |
|---|---|
| Ex. 4A | IEEE Std 802.1Q-1998, Virtual Bridged Local Area Networks |
| Ex. 4B | Lasserre et al. Virtual Private LAN Services over MPLS, IETF draft-ietf-12vpn-vpls-1dp-08.txt, November 2005 |
| Ex. 4C | DeCusatis, Fiber Optic Data Communication Technological Trends and Advances, Academic Press, 2002 |
| Ex. 4D | RCA Engineer, Vol. 30, No. 1, Jan./Feb. 1985 |
| Ex. 4E | Excerpt of Leon Bruckman Deposition Transcript taken on November 2, 2023 in *Corrigent Corporation v. Cisco Systems, Inc.*, 6:22-cv-00396 (W.D. Tex.) |
| Ex. 4F | IEEE Std. 896.1-1991, *IEEE Standard for Futurebus+ - Logical Protocol Specification*, September 26, 1991 |
| A | Rebuttal Declaration of Dr. William R. Michalson ("Michalson") |
| B | *Idle*, *Subsidiary*, Collins English Dictionary, Harper Collins (5th ed. 2000) |
| C | *Idle*, *Subsidiary*, Random House Webster's Unabridged Dictionary (2d ed. 2001) |
| D | *Subsidiary*, Funk & Wagnalls New Int'l Dictionary of the English Language (2000) |
| E | *Corrigent Corp. v. Cisco Sys., Inc.*, No. 6:22-cv-00369-ADA, Dkt. 69 (W.D. Tex. Mar. 21, 2023) |
| F | *Back*, The American Heritage Dictionary of the English Language (4th ed. 2000) |
| G | *Back*, Oxford English Dictionary (2023), *available at* https://www.oed.com/dictionary/back_adv?tab=meaning_and_use#30512240 |
| H | *Backplane*, The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) |
| I | *Backplane*, Novell's Complete Encyclopedia of Networking (1st ed. 1995) |
| J | Supplemental Rebuttal Declaration of Dr. William Michalson, dated February 29, 2024 ("Michalson Supp.") |

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '369 or '369 patent | U.S. Patent No. 6,957,369 |
| '400 or '400 patent | U.S. Patent No. 7,593,400 |
| Arista | Arista Networks, Inc. |
| Arista IPR | *Arista Networks, Inc., v. Corrigent Corporation*, IPR2023-00805 |
| Asserted Patents | U.S. Patent Nos. 6,957,369 and 7,593,400 |
| Cisco Case or *Cisco* | *Corrigent Corporation v. Cisco Systems, Inc.*, 6:22-cv-00396 (W.D. Tex.) |
| Corrigent | Plaintiff Corrigent Corporation |
| Defendants | Dell and Arista |
| Dell | Dell Technologies Inc. and Dell Inc. |
| Dell IPR | *Dell Technologies Inc. et al v. Corrigent Corporation*, IPR2023-00370 |
| Ex. | Exhibit |
| FDB | Forwarding Database |
| *Ke* | U.S. Patent No. 5,841,788 |
| LAG | Link Aggregation Group |
| LAN | Local Area Network |
| MAC | Media Access Control |
| Michalson | Rebuttal Declaration of Dr. William R. Michalson |
| Michalson Supp. | Supplemental Rebuttal Declaration of Dr. William Michalson, dated February 29, 2024 |
| Olivier | Declaration of Dr. James Olivier in Support of Corrigent's Opening Claim Construction Brief (Ex. 2 to Corrigent Corporation's Opening Claim Construction Brief) |
| PCB | Printed Circuit Board |
| POSA | Person of Ordinary Skill in the Art |
| Reply | Corrigent Corporation's Reply Claim Construction Brief |
| VPN | Virtual Private Network |

## EXEMPLARY CLAIMS

| Claim 1 of the '369 Patent |
|---|
| 1[p].  In an electronic system that includes a main module and at least first and second subsidiary modules connected to the main module by one or more lines for carrying data, at least some of which lines are sometimes idle, the main module including a switch having ports connected to the lines, a method for self-testing, comprising: |
| [1A] selecting a first idle line among idle lines connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid line; |
| [1B] instructing the first subsidiary module to loop back traffic reaching the first subsidiary module via an aid line; |
| [1C] selecting for testing a second idle line among the idle lines connecting the second subsidiary module to a second port of the switch on the main module; |
| [1D] configuring the switch to link the first and second ports; |
| [1E] transmitting test traffic over the second idle line from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid line connecting to the first subsidiary module; and |
| [1F] reporting that a failure has occurred if the test traffic does not return to the second subsidiary module within a predetermined period of time. |

| Claim 15 of the '369 Patent |
|---|
| 15.  Modular electronic apparatus, comprising: |
| [15A] a backplane, which comprises traces for carrying data between modules that are plugged into the backplane; |
| [15B] a main module, plugged into the backplane, the main module comprising a switch having ports for connection to the traces of the backplane; |
| [15C] at least first and second subsidiary modules, plugged into the backplane so as to be connected to the main module by the traces, at least some of which traces are sometimes idle; and |
| [15D] a system control processor, which is operative to select a first idle trace among idle traces connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid trace, to instruct the first subsidiary module to loop back traffic reaching the first subsidiary module via the aid trace, to select for testing a second idle trace among the idle traces connecting the second subsidiary module to a second port of the switch on the main module, and to configure the switch to link the first and second ports, the system control processor being further operative to cause test traffic to be transmitted over the second idle trace from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid trace connecting to the first subsidiary module, and to report that a failure has occurred if the test traffic does not return to the second subsidiary module within a predetermined period of time. |

| Claim 1 of the '400 Patent |
|---|
| 1.  A method for communication, comprising: |
| [1A] configuring a network node having a plurality of ports, and at least first and second line cards with respective first and second ports, to operate as a distributed media access control (MAC) bridge in a Layer 2 data network; |
| [1B] configuring a link aggregation (LAG) group of parallel physical links between two endpoints in said Layer 2 data network joined together into a single logical link, said LAG group having a plurality of LAG ports and a plurality of conjoined member line cards; |
| [1C] providing for each of said member line cards a respective forwarding database (FDB) to hold records associating MAC addresses with ports of said plurality of ports of said network node; |
| [1D] receiving a data packet on an ingress port of said network node from a MAC source address, said data packet specifying a MAC destination address on said Layer 2 data network; |
| [1E] conveying, by transmitting said data packet to said MAC destination address via said first port, said received data packet in said network node to at least said first line card for transmission to said MAC destination address; |
| [1F] if said MAC destination address does not appear in said FDB, flooding said data packet via one and only one LAG port of said plurality of LAG ports; |
| [1G] checking said MAC source address of the data packet against records in said FDB of said first line card; and |
| [1H] if said FDB of said first line card does not contain a record of an association of said MAC source address with said ingress port, creating a new record of said association, adding said new record to the FDB of said first line card, and sending a message of the association to each member line card of said plurality of member line cards. |

| Claim 8 of the '400 Patent |
|---|
| 8. The method according to claim 1, wherein the network node is configured to operate as multiple virtual MAC bridges in a Layer 2 virtual private network (VPN), wherein each virtual MAC bridge is configured to serve a respective VPN instance, and wherein the records associating the MAC addresses with the respective ports are maintained independently for each of the VPN instances. |

| Claim 11 of the '400 Patent |
|---|
| 11.  A node for network communication, comprising: |
| [11A] a switching core; |
| [11B] a plurality of ports; |
| [11C] a plurality of member line cards conjoined in a link aggregation (LAG) group of parallel physical links between two endpoints in a Layer 2 data network joined together into a single logical link, having a plurality of LAG ports to forward packets through said switching core so that the node operates as a virtual media access control (MAC) bridge in said Layer 2 data network, said plurality of member line cards including at least first and second line cards, each line card having respective ports and having a respective forwarding database (FDB) to hold records associating MAC addresses with said respective ports of said line cards, |
| [11D] wherein said line cards are arranged so that upon receiving a data packet on an ingress line card from a MAC source address, said data packet specifying a MAC destination address, said ingress line card conveys said data packet via said switching core to at least said first line card for transmission to said MAC destination address, whereupon said first line card checks said MAC source address of said data packet against records in said FDB of said first line card, and if said FDB database of said first line card does not contain a record of an association of said MAC source address with said ingress port, adds said record to the FDB of said first line card and sends a message to at least said second line card informing said second line card of said association, and arranged, when said MAC destination address does not appear in said FDB, to flood said data packet via one and only one of said LAG ports. |

| Claim 18 of the '400 Patent |
|---|
| 18. The node according to claim 11, wherein at least some of the line cards are configured so that the node operates as multiple virtual MAC bridges in a Layer 2 virtual private network (VPN), wherein each virtual MAC bridge is configured to serve a respective VPN instance, and wherein the records associating the MAC addresses with the respective ports are maintained independently for each of the VPN instances. |

## I.      AGREED-UPON CONSTRUCTIONS

| Claim Term | Agreed Construction |
|---|---|
| forwarding database (FDB) | No construction necessary. |

## II.     DISPUTED CONSTRUCTIONS

### A.     INTRODUCTION

#### 1.   Corrigent's Opening Brief

Corrigent's proposed claim constructions are consistent with the claims, the intrinsic evidence, extrinsic evidence, and the plain and ordinary meaning of those terms. Defendants, in an effort to read improper extraneous limitations into the claims, assert that the Court should construe numerous terms even though the terms are clear on their face and need no construction. Defendants also incorrectly assert that numerous terms are indefinite.  Defendants' proposals are unsupported and are merely transparent attempts to avoid liability.

Many of the terms for construction that the Defendants have put at-issue in these cases have already been construed by Judge Albright in a pending case against Cisco Systems, Inc. *Corrigent Corporation v. Cisco Systems, Inc.*, 6:22-cv-00396 (the "Cisco case"). There, Judge Albright rejected many of the same or similar arguments that the Defendants now argue to this Court for construction.

#### 2.   Defendants' Answering Brief

Defendants' proposed claim constructions are rooted squarely in the plain language of the claims, as informed by the specification. They capture the plain language of the claims as a person of ordinary skill in the art ("POSITA") would understand them in light of the specification. Defendants' constructions also clarify that certain claim steps must be performed in the order specified by the claim language, as later steps specifically refer back to the results of previous steps.  For two terms ("said FDB" and "virtual MAC bridge"), Defendants cannot propose a construction because the terms are hopelessly indefinite.  Defendants respectfully request that the Court adopt Defendants' constructions.

### 3. Corrigent's Reply Brief

Defendants largely ignore Corrigent's arguments and assert that this Court should adopt unduly narrow constructions that were already rejected by another court. Defendants' indefiniteness arguments also fail to carry water. Not one of the USPTO, the PTAB, Judge Albright in the Western District of Texas, nor the Defendants (before now) have had any issue understanding the scope of the claims of the '400 Patent and they are not "hopelessly indefinite."

## III.    BACKGROUND OF THE TECHNOLOGY

### 1. Corrigent's Opening Brief

#### a. The '369 Patent

The '369 patent addresses diagnostic challenges in the detection of "hidden failures" in electronic components, with a specific focus on non-intrusive self-testing of communication systems. This functionality is important to detect failures in faulty idle components that may otherwise remain unnoticed until the component is used. In some embodiments of the '369 Patent, the system tests idle lines by looping back traffic without disrupting the flow of data over the network. This invention allows for early detection of hidden failures, ensuring system reliability and uninterrupted service.

#### b. The '400 Patent

The '400 Patent is directed to efficiently managing traffic in a computer network, specifically a network involving a distributed bridge or switch. The claimed methods and devices of the '400 Patent recite an architecture that also includes a "link aggregation group" or "LAG." "Link aggregation (LAG) is a technique by which a group of parallel physical links between two endpoints in a data network can be joined together into a single logical link (referred to as the 'LAG group')." '400 Patent 2:37–40. Each line card of the distributed system includes its own

forwarding database (FDB). Whereas prior art systems relied on "flooding" (or a broadcast of a packet to all the ports of the bridge) for "learning" about new MAC addresses connected to the network, the '400 Patent introduces and claims a novel MAC synchronization message relating a new MAC source address with a port. This MAC synchronization message reduces the need for constant flooding. In short, the '400 Patent describes methods and devices for MAC address learning in a distributed bridge, including MAC source address synchronization within a LAG group. These methods and systems reduce unnecessary flooding, enhancing overall network communication efficiency.

### 2.  Defendants' Answering Brief

#### a.  The '369 Patent

The '369 patent is directed to testing whether idle (i.e., inactive) lines are functioning properly "without intruding on normal traffic carried by the system's active lines." '369 patent, 2:26-29.  The '369 patent refers to idle line failures "as 'hidden failures,' because they do not affect service at the moment they occur and thus may go undetected." *Id.*, 1:11-15.  The concept of testing lines while they are idle (where failures would otherwise "go undetected") is so integral to the patent that the patent is named "Hidden Failure Detection." *Id.*, [54].

The '369 patent describes a backplane system in which a "main module" and two or more "subsidiary modules" are plugged into the backplane and communicate over traces on the printed circuit board of the backplane. *Id.*, 1:11-36; 1:61-2:4; 2:40-47; 3:12-20; 3:51-4:37; 6:54-67.  The main module 24 is connected to the network (*id.*, 1:67-2:2; 5:13-14) and contains a system control processor 42 and a switch 28. *Id.*, 1:30-32; 5:1-31.  To test the system without interrupting service, the idle lines 38 are tested instead of the active lines 36. *Id.*, 5:26-31.  Figure 1 depicts this arrangement:



#### b.  The '400 Patent

The '400 patent is generally directed to learning Media Access Control ("MAC") source addresses in a distributed bridge.  MAC learning is a process by which a switch "learns" about a source address of a data packet, so the switch will know which port to forward future packets received with a destination address matching a previously learned source address.



*Id.*, Fig. 1.

With reference to Figure 1, to send a packet from a source computer (**22**) to a destination computer (**24**), the packet is sent through different nodes in the network (e.g., node **30**). Each node has multiple line cards (**32**) and each line card has ports (**36**) that provide links to other devices outside of the node. '400 patent, 6:8-16. Each line card in a node contains a forwarding database (FDB) indicating which devices can be reached through each port. *Id.*, 3:20. When an ingress line card of a node receives an incoming data packet "it consults the FDB in order to choose the line card and port through which the packet should be forwarded based on the MAC destination address." *Id.*, 3:11-17. The ingress line card conveys the packet to the appropriate egress line card for transmission, and the egress line card checks the packet's MAC source address against its FDB and updates the FDB with the source address information, if needed. *Id.*, 3:18-24.

Figure 2 of the '400 patent illustrates the ingress and egress paths. When an incoming packet is received on a port, the data packet "passes the packet to **ingress path 54**." *Id.*, 7:25-41. Upon ingress, the FDB is checked to see if the MAC destination address is in **database 58**. If the bridge does not recognize the MAC address, the bridge will "flood" the network—*i.e.*, send the packet through all of the bridge ports. *Id.*, 1:33-46. If, on the other hand, the record is found, the packet processor "adds a tag to the packet indicating the egress port through which the packet should be forwarded." *Id.*, 7:31-35. Once tagged, the packet processor "passes the tagged packet to switching core 34," and it is then conveyed "to **egress path 56**." *Id.*, 7:25-41. The purpose of the egress path is to "transmit the packet onward [and] check[] the MAC source address of the data packet against the records in its own FDB." *Id.*, 3:18-20. "If the FDB of the transmitting line card [*i.e.*, the egress line card] does not contain a record associating the MAC source address with the port of the ingress line card on which the data packet was received, the transmitting line card adds the record to its FDB." *Id.*, 3:20-24. Thus, it is during the egress processing (i.e., as the packet is

exiting the node) that MAC learning occurs where the MAC source address (SA) is checked against the FDB records on the egress line card.



*Id.*, Fig. 2 (color annotations).

According to the patent, however, MAC addresses learned on one particular line card are not automatically shared with other line cards in a bridge, for example, because packets are flooded only over one port in a group of ports that are logically joined together as a link aggregate group or LAG **38**.  *Id.*, 3:34-41.  The patent therefore teaches that the "line card sends a synchronization message to the remaining line cards, informing them of the association of the MAC source address with the ingress port."  *Id.*, 3:24-27, 3:43-45.



## IV.    LEGAL PRINCIPALS

### 1.    Corrigent's Opening Brief

"[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321. The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

However, "even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) quoting *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).  Furthermore, "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). Order of steps limitations should not be imposed when "the stated purpose" of an invention "could be achieved" with different orderings. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003). It is generally improper to "import a sequential limitation into an apparatus claim." *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 2008 WL 5061625, at *16 (E.D. Tex. Nov. 24, 2008); *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008). Similarly, while "a method claim necessarily recites the steps of the method in a particular order, as a general rule the

claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin*, 512 F.3d at 1345.

Courts may also rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id*.

A claim is not invalid as indefinite if, "read in light of the specification delineating the patent, and the prosecution history, [the claim] inform[s], with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). The inherent limitations of language must be taken into account, and "[s]ome modicum of uncertainty is the price of ensuring the appropriate incentives for innovation." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).

## V.  CLAIM CONSTRUCTIONS OF THE '369 PATENT

### A.  "main module" (claims 1, 2, 4, 5, 8, 9, 10, 11, 15, 16, 18, 21, 22, 23)

| Corrigent Construction | Defendants' Construction |
|---|---|
| No construction necessary.<br><br>Alternatively, plain and ordinary meaning which is a module that has a connection to one or more subsidiary modules via one or more data lines or traces. | "a hardware module that combines data from subsidiary modules"[2] |

---

[2] Defendants modify the proposed construction to narrow the disputes and address Corrigent's arguments regarding "multiplex" and "switch" in Defendants' original proposal.

### 1. Corrigent's Opening Brief

The term main module needs no construction. This term is readily understood by one of skill in the art and does not require construction. To the extent the term needs any construction, it should be given its plain and ordinary meaning which is "a module that has a connection to one or more subsidiary modules via one or more data lines or traces." This construction is supported by the intrinsic evidence. *See, e.g.*, '369 Patent, Abstract; Fig. 1; 1:26-36; 1:61-2:4; 4:54-67; 5:13-18; Ex. 1A; Ex. 1B. Corrigent's construction is consistent with the understanding of a POSA. Ex. 2, ¶¶ 20-21.

Defendants improperly read in multiple limitations into their construction that are not the plain and ordinary meaning of this term. Specifically, the term main module is not limited to hardware modules with a switch for multiplexing. This is not the plain and ordinary meaning and there was no special definition or disclaimer limiting main module to such a specific narrow construction. As Dr. Olivier explains, the claims make it clear that main module does not have to require a switch as claim 8 recites a main module that does not recite a switch and claim 11, which depends from claim 8, recites that "the main module comprises a switch." *Id.* at 22. The specification also confirms that a switch in the main module is optional. *Id.* citing '369 Patent at 1:30-32 (switch is typically included but not required); 1:27-29 ("a backplane may be used to connect a main module, having a trunk link to a core network, to a number of subsidiary modules, such as line cards"); 1:61-64 ("an electronic system comprises a master module and multiple subsidiary modules, each of which is connected to the master module by one or more connection lines"). Furthermore, Defendants' construction would only cause jury confusion by introducing other words like multiplexing.

### 2.  Defendants' Answering Brief

The '369 patent is built on the notion that the main module combines data from subsidiary modules so it can be sent to other devices in the network, as described below.  It is that relationship between modules that makes one module the "main" and other modules "subsidiary."  Corrigent seeks to effectively excise the word "main" from the claims—just as it later tries to excise the word "subsidiary" from the claim—so that it can try to read the claims on testing between two peers that have no main/subsidiary relationship at all.  Corrigent's attempt to strip the claims of this relationship between a main and subsidiary module should be rejected.

At the outset, Corrigent does not dispute that the main module is *hardware*.  *See supra* V.A.1, p. 10; Ex. 2 (Olivier) ¶ 22; Ex. A (Michalson) ¶¶ 18-19, 21.  Moreover, the specification "repeatedly, consistently, and exclusively" describes that hardware as a module that combines data from subsidiary modules.  *See In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149-50 (Fed. Cir. 2012).  What makes the main module a "main" module is its relationship to the subsidiary module. In the sole disclosed embodiment, the main module performs the task of "multiplexing among the subsidiary modules."  '369 patent, 1:30-33; 5:1-3 ("switch 28 *aggregates* upstream traffic from ports 30"), 5:13-16 ("System 20 thus provides *multiplexed* network access for users who are connected to subsidiary modules 24."); Ex. A (Michalson) ¶ 20.  This is shown in Fig. 1:



As shown above, the main module 22 combines data from subsidiary modules 24, labeled modules A, B, . . . K, and sends the data to the network. Defendants' construction gives meaning to the word "main." That is, the *main* module is the focal point of the system architecture because it combines (i.e., aggregates or multiplexes) the data from and controls the subsidiary modules.[3] *See* '369 patent, 2:44-47, 3:24-27, 4:60-63, 5:1-5, 5:13-16; Ex. A (Michalson) ¶ 22.

Corrigent's proposal reads out the word "main" and improperly proposes near-identical constructions for "main module" and "subsidiary module." *See Bio-Rad Lab'ys., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1331 (Fed. Cir. 2021) (rejecting a construction "premised on rewriting the claims in an oversimplified form and removing all limitations that differentiate the recited structures from each other"). Corrigent's proposal should be rejected.

---

[3] For the reasons explained below, *infra* V.B.2, the main module controls the subsidiary modules.

### 3. Corrigent's Reply Brief

Defendants do not dispute that a main module is "a module that has a connection to one or more subsidiary modules via one or more data lines or traces," per Corrigent's construction.

Regarding additional requirements, Defendants have now abandoned their initial construction requiring a "switch for multiplexing" (*see* D.I. 72), and for the first time assert that a main module "combines data from subsidiary modules." However, the specification and claims do not discuss a main module that "combines data" from anything, let alone from subsidiary modules. Dr. Olivier agrees. Ex. 4, ¶¶11-13. Defendants' argument for the new "combining data" requirement is based on characterizations and annotations of the '369 Patent's Figure 1—a "preferred embodiment." '369 Patent at 4:43-46, 4:54-56. It is a "cardinal sin" of claim construction to construe claims based on preferred embodiments. *Philips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005).

To the extent that Defendants rely on the specification's references to "multiplexing" or "aggregating" as combining data, these disclosures are optional components of the invention. The main module "*typically* includes a switch for multiplexing among subsidiary modules." '369 Patent at 1:30-32. And aggregation is referenced in the context of Figure 1—a preferred embodiment. '369 Patent at 5:1-3 ("[I]n this embodiment, switch 28 aggregates"), 5:21-24 ("aggregated by switch 28"). The mere disclosure of an embodiment that can aggregate data from other modules does not support a "combining" requirement.

Defendants complain that Corrigent's construction of main module "reads out the word 'main' and improperly proposes near-identical constructions for 'main module' and 'subsidiary module.'" But they ignore that the claim language circumscribes the relevant differences and recites distinct requirements that apply to the "main module" and "subsidiary module" in each

claim, including details on the modules' interconnections and the test traffic that travels amongst them. Thus, Corrigent's construction does not "remov[e] all limitations" that differentiate the main and subsidiary modules from one another.

Finally, Defendants' attempt to inject "hardware" into the construction is improper, as neither a main nor subsidiary module is limited to a hardware based implementation. A main module can comprise software (such as that which runs on a processor), and the POSA would understand that hardware modules can be implemented virtually in software, consistent with the disclosures of the patent. Ex. 4,¶¶ 14&17; '369 Patent at 5:5-9, 6:10-16.

### 4. Defendants' Sur-Reply Brief

Corrigent's construction of "main module" is nearly identical to its construction of "subsidiary module," eviscerates the differences in the terms, and ignores that the specification exclusively describes the "main module" as combining data from subsidiary modules and including a switch. '369 Patent, 1:30-33, 1:67-2:2, 3:12-16, 5:1-9, 5:21-26, Fig. 1. Contrary to Plaintiff's assertion, the claim language (reciting "plug[ging] in" the main module) limits the main module to hardware. *Id.*, cls. 1, 5, 10, 15, 21. The hardware main module and hardware subsidiary modules plug into the hardware backplane, and the main module connects to the subsidiary module via "lines" and "traces," which are hardware components of the backplane. *Id.*, 1:30-33, 5:1-3, 5:13-16. Corrigent's two citations discuss virtual connections *between subsidiary modules*, but neither citation suggests that the main module itself is or even can be virtual. *Id.*, 5:5-9, 6:10-16.

### B. "subsidiary module" (claims 1, 2, 3, 5, 8, 9, 10, 11, 12, 15, 16, 17, 21, 22, 23, 24)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| No construction necessary.<br>Alternatively, plain and ordinary meaning which is a module that has a connection to a main module via one or more data lines or traces. | "a hardware module under the control of the main module" |

### 1.  Corrigent's Opening Brief

Again, the term subsidiary module needs no construction.  To the extent that this term needs any construction, it is merely to confirm that there is **some** relationship between the "main module" recited in the claims and any "subsidiary" modules, so it is clear that "subsidiary modules" must somehow be connected to the main module. The intrinsic record confirms that this is the only relational requirement between the subsidiary module and the main module.

First, the claim language states that "first and second subsidiary modules [are] **connected to the main module by one or more lines for carrying data**."  '369 Patent at 7:4-5 (claim 1). Second, the specification indicates that subsidiary modules are merely connected to the main module. *E.g.*, '369 Patent at Abstract ("subsidiary modules, which are connected to the main module"); 1:27-29 ("a backplane may be used to connect a main module, having a trunk link to a core network, to a number of subsidiary modules, such as line cards"); 1:61-64 ("an electronic system comprises a master module and multiple subsidiary modules, each of which is connected to the master module by one or more connection lines"). Thus, both the claim language and the specification confirm that a connection between the subsidiary module and the main module is all that is required.

Defendants seek to improperly add an extraneous limitation that subsidiary modules must necessarily be "**under the control** of the main module." This requirement is not found in the claims, specification, or the prosecution history.  While the main module can control a subsidiary module, the claim language does not require as much.  For example, claim 15 recites a "system control processor," that is separate and distinct from the main module.  Claim 16, which depends from claim 15, states that the first subsidiary module is configured "under control of the system control processor."  Thus, to the extent anything is contemplated as controlling a subsidiary module, it is

the system control processor, not necessarily the main module, which can be separate and distinct from the main module.  Ex. 2, ¶24.

The '369 Patent is also at issue in the Cisco case.  In the Cisco case, Judge Albright considered and rejected the same argument in the Cisco case.  *See* Ex. 1C.

### 2.  Defendants' Answering Brief

Defendants' construction, which is fully supported by the intrinsic record, gives meaning to "subsidiary module" by explaining what subsidiary means (*i.e.*, controlled by something) and identifying the thing that controls it (*i.e.*, main module), whereas Corrigent seeks to redefine "subsidiary" under the guise of "plain and ordinary meaning."  Therefore, there is clearly a dispute about what the meaning of this claim term is that the Court must resolve.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

Based on the plain language, a "subsidiary module" requires two things:  that it is a module, and that it is subsidiary to something.  *See* Exs. C at 1896, B at 1527, D at 1249-50.  The surrounding claim language also mandates that the main module controls the subsidiary module.  The claims recite that the subsidiary module is instructed by the system control processor—part of the main module—to perform the required steps.[4]  For example, the main module selects the subsidiary module and idle line and instructs the subsidiary module to send test traffic.  '369 patent, cls. 15, 21, 2:5-17; 5:41-45.  Therefore, Defendants' construction simply gives effect to the claim language, which mandates that the subsidiary module is under the control of the main module—something a jury may not appreciate if relying only on "plain and ordinary meaning."

---

[4] Corrigent concedes that the system control processor controls the subsidiary module, *supra* V.B.1, p.16, but the system control processor is itself part of the main module. *Infra* V.E.2.

Additionally, the specification expressly describes the main module as controlling the subsidiary module via "a separate control channel." *Id.*, 5:41-45. The patent also emphasizes that the subsidiary module is not required to do any processing, and instead operates under the control of the main module. *Id.*, 2:9-12. The '369 patent exclusively describes the subsidiary module according to its relationship with the main module. *Id.*, 1:25-36. The subsidiary module also entirely relies on the main module to access the wider network and other subsidiary modules. *See id.*, 4:54-5:9; Fig. 1; *see also* Ex. A (Michalson) ¶¶ 28-29.

Corrigent's proposal—which rewrites "subsidiary module" to encompass any module that connects to a main module regardless of their relationship—illustrates Corrigent's mischief. Ex. A (Michalson) ¶ 30. Corrigent does not dispute that the subsidiary module is *hardware*. *See supra* V.B.1, pp. 15-16; *see also* Ex. 2 (Olivier) ¶¶ 23-24; Ex. A (Michalson) ¶¶ 24-25. But Corrigent's construction seeks to effectively eliminate the word "subsidiary" and replace it with a mere connection so that it can accuse two peer nodes that have no subsidiary/main relationship at all. Such an attempt to ignore claim language cannot be right. *See Bio-Rad Lab'ys*, 998 F.3d at 1331. The mere fact that two devices are connected does not mean that one is "subsidiary" to the other. In other words, it is the nature of the relationship between modules that makes one a main module and the other a subsidiary. *See* '369 patent, cl. 1 ("subsidiary modules connected to the main module"), cls. 8, 15, 21; Ex. A (Michalson) ¶¶ 26-27. Here, what makes a module "subsidiary" is that it is under the control of the main module. '369 patent, 2:5-17, 5:41-45, cls. 1, 8.

### 3. Corrigent's Reply Brief

Defendants' construction that a subsidiary module must be "under the control of the main module" was already rejected by the Western District of Texas in *Corrigent v. Cisco*, and nothing in the claim language, specification, or prosecution history supports it. *See* Ex. 1C at 2.

Defendants' construction is based on generic non-technical dictionary definitions of "subsidiary," which do not support improperly rewriting the claims. *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) (extrinsic evidence cannot be used to limit the language of the patent). Furthermore, Defendants' definitions do not demonstrate that a control relationship is required, but suggest that something "subsidiary" might merely "assist," "aid or supplement." Ex. B at 1527; Ex. C at 1896.   Defendants also assert that their dictionary definition construction is supported by the claims and specification.   But the Defendants fail to discuss any specific claim language because the claims do not support their construction. Indeed, the only thing that the claim language suggests ***might*** control a subsidiary module is a system control processor—not a main module—and that particular requirement is only recited in dependent claim 16.[5]   In claim 15 from which claim 16 depends, the "system control processor" is recited in a separate limitation from the "main module," underscoring that the system control processor need not be part of the main module.   Moreover, the "system control processor" is not even recited in independent claim 1 or any of the claims depending therefrom.   Thus, the POSA would not understand that a subsidiary module must be under the control of a main module. Ex. 4, ¶¶15-16. While Defendants assert that the specification supports their construction, the specification never states that that subsidiary modules must be controlled by a main module.

Defendants assert that Corrigent's proposal eliminates "subsidiary" from the claim language.   But Defendants again ignore that the claim language circumscribes the role that the main module and subsidiary modules play within each particular claim.   Defendants admit that "it is the nature of the relationship between modules that makes one a main module and the other a

---

[5] Corrigent never "concede[d]" that the system control processor controls the subsidiary module," but rather acknowledged that the subsidiary module is under the control of the system control processor in a single dependent claim—claim 16.

subsidiary."  In so doing, they cite the portion of the claim language of claim 1 requiring that "subsidiary modules [are] connected to the main module" which simply confirms that Corrigent's construction is the most appropriate one.  The claim language does not require that a subsidiary module is necessarily controlled by a main module; Defendants' construction is belied by the claim language itself.

### 4.  Defendants' Sur-Reply Brief

Defendants' construction is rooted not only in the plain meaning of the term "subsidiary," but also in the intrinsic record. The patent specifically states that the main/master module instructs and supervises the subsidiary modules via control lines connecting the main and subsidiary modules. '369 patent, 2:5-25, 5:41-45. This is consistent with the claims. *Id.*, cls. 1, 2, 8, 9, 15. Although Corrigent argues the system control processor controls the subsidiary module, the patent specifically states that "the system control processor [is] in the main module," further supporting Defendants' construction. *Id.*, 5:41-42.

Finally, that the *Cisco* court adopted a "plain and ordinary" meaning is not relevant, as the parties here disagree as to what that plain meaning is.

### C.    "backplane" (claims 15, 10, 15, 21)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning, which is hardware used to establish interconnections between modules. | "a printed circuit board, in the back of communications equipment, providing communications pathways between modules" |

### 1.  Corrigent's Opening Brief

Corrigent's construction informs the jury that a backplane is hardware used to establish interconnections between modules.  Defendants again attempt to read in numerous limitations, asserting that "backplane" should be construed as "a printed circuit board located in the back of communications equipment containing slot connectors into which edge connectors of circuit

boards are inserted." While this is *one example* of what a backplane could be, there is nothing in the claims or specification that defines backplane so narrowly.

Corrigent's construction is supported by the intrinsic evidence and more accurately captures the plain and ordinary meaning of "backplane" from the perspective of a POSA. Ex. 2, ¶ 25. *First*, the point of a backplane is to "establish interconnections between modules.". The specification recites that a "backplane may be used to *connect*" main modules to subsidiary modules. '369 Patent at 1:25-30 (emphasis added), 4:58- 61 ("backplane … includes traces 34 that *connect the modules*"). The specification also refers to "backplane interconnect testing," which reinforces that the backplane establishes interconnections. *Id.* at 1:47-49.

*Second*, the intrinsic record confirms that the backplane can be implemented using hardware other than a printed circuit board. The specification nowhere refers to backplanes as being limited to a "printed circuit board." In fact, the patent does not reference a "printed circuit board" or PCB, a single time. The relevant independent claims, likewise, do not reference a PCB. *See id.* Claims 15, 21. The claims refer to a "backplane … which comprises *traces for carrying data*," but the claims do not purport to limit traces to only those on a PCB.

Defendants' construction improperly limits backplanes to: (1) only PCB's; (2) a specific location (only the back); (3) with slot connectors; and (4) receiving edge connectors.  Such a narrow construction with numerous extraneous limitations is clearly improper and unsupported. Ex. 2, ¶¶ 26-27.

Judge Albright in the Cisco case rejected Cisco's construction of "a printed circuit board into which modules may be inserted" (which is not even as improperly narrow as what Defendants propose here) and adopted Corrigent's construction of "hardware used to establish interconnections between modules."  Ex. 1C at 3.

### 2.  Defendants' Answering Brief

Defendants' construction is mandated by the plain meaning of the term and the intrinsic evidence.  Corrigent—as with the other terms—seeks to eliminate the notion of a backplane altogether from the claims and replace it with *any* hardware connections.

The '369 patent defines "backplane" by incorporation of the Ke reference to describe known "methods for backplane interconnect testing." '369 Patent, 1:47-49.  Ke states: "Backplanes have slot connectors into which the edge connectors of circuit boards are inserted and have interconnects for providing communication pathways between boards." Ke, 1:23-26.  *X2Y Attenuators, LLC v. U.S. Int'l Trade Comm'n*, 757 F.3d 1358, 1362-63 (Fed. Cir. 2014).  The entirety of Ke's disclosure describes backplanes as a printed circuit board into which boards are plugged.  *See, e.g.,* Ke at 1:26-32; 1:65-2:4; 3:15-23; 4:66-5:9.  This is the same meaning that a person skilled in the art would understand backplane to mean.  Ex. A (Michalson) ¶ 36.  The '369 patent specification similarly uses the term "backplane" to mean only one thing: a "printed circuit" into which modules are plugged and connected via "printed circuit traces."  *See, e.g.*, '369 patent, 1:64-67.  And finally, the claims themselves invoke the same well-known meaning of a backplane by reciting "traces" that connect "modules, plugged into the backplane."  *Id.*, cls. 15, 21.  Traces, and modules that are plugged "into" the backplane, have meaning only in the context of a printed circuit board with slot connectors that can receive such modules.  Ex. A (Michalson) ¶ 36.

Corrigent seeks to delete backplane (and traces) from the claims so it can try to read its claims on network nodes communicating with each other over the Internet.  That is why Corrigent seeks to replace the concept of a "backplane" with mere "interconnections."  That proposal has no support in the plain meaning of the claims or the intrinsic record.  Moreover, by arguing that backplanes are not located in the back of communications equipment, Corrigent reads out "back"

from "backplane." *Supra* V.C.1, pp. 20-21.  The term "back" is well understood to refer to the rear. *See* Exs. F at 130, G at 1.  Corrigent's attempts to delete inconvenient claim language should be rejected.

Finally, extrinsic evidence supports Defendants.  Technical dictionaries, including from a leading standards organization, support the construction that backplanes are printed circuit boards. *See, e.g.*, Ex. H at 78 (IEEE) ("the printed circuit board that contains the connectors and interconnect traces"; "a printed circuit board (pcb) on which connectors are mounted, into which boards or plug-in units are inserted"; "a printed-circuit board (pcb) with 96-pin connectors and signal paths that bus (connect corresponding) connector pins"); Ex. I at 80 (Novell's) ("A backplane is a circuit board with slots into which other boards can be plugged[.]").  Corrigent resorts to expert testimony (*supra* V.C.1, p. 21) that the prior art teaches backplanes (like "Futurebus+") that do not require a printed circuit board.  Ex. 2 (Olivier) ¶ 26.  But the Futurebus+'s backplane *is* a printed circuit board. Ex. A (Michalson) ¶¶ 32-33.  Contrary to Dr. Olivier's assertions, references to "loosely" or "tightly coupled" in the description of Futurebus+ refer to the architecture of the processors, not the backplane. *Id.* ¶¶ 34-35.

Corrigent should not be permitted to again elide unwanted claim language; backplane should be construed how it is used and defined in the specification, and how it is used in the claims.

### 3.  Corrigent's Reply Brief

Defendants also abandoned their original construction of "backplane." *See* D.I. 72 at 8. The Court in *Corrigent v. Cisco* adopted Corrigent's construction that a backplane is "hardware used to establish interconnections between modules." Defendants' new proposed language that a backplane "provid[es] communications pathways between modules" underscores that Defendants

agree that a backplane furnishes interconnections.  This should end the matter.  But Defendants attempt to add additional requirements into the construction.

*First*, Defendants incorrectly maintain that a backplane must be limited to a "printed circuit board."  While Defendants attempt to use the incorporated Ke reference, the '369 Patent states that Ke merely provides "another example" of testing backplane-based interconnections.  '369 Patent at 1:48-50.  Thus, even if Defendants' characterize Ke correctly, Ke does not limit the meaning of backplane.  Moreover, Defendants argue that the '369 Patent's disclosures discuss backplane as "mean[ing] only one thing: a 'printed circuit' into which modules are plugged and connected via 'printed circuit traces.'"  But the specification's single reference to "printed circuit traces" acknowledges that such traces are "[t]ypically" (not always) used, and does not state that a "backplane" is limited to a PCB.  '369 Patent at 1:64-67.

Extrinsic evidence confirms that backplanes are not limited to connections using printed circuitry, but can also include connections using cables or wires.  Ex. 4C at 231-232 (describing fiber-cabled backplane); Ex. 4D at 56 (describing "backplane connectors" as being "cables"). Ex. 4, ¶23.  Such configurations are consistent with Dr. Olivier's discussion of FutureBus+, which contemplated "loosely coupled" backplane configurations (consistent with the use of cabling), that would not require the use of tightly coupled printed circuit interconnections. Ex. 4, ¶¶19-21.  Dr. Olivier maintains that his discussion of FutureBus+ relates to the backplane.  *Id.*   Even one of Defendants' definitions underscores that a PCB is not required because it generically states, much like Corrigent's construction, that a backplane is "[t]he physical mechanism by which signals are routed between agents."  Ex. H at 79 (entry 5).

*Second*, Defendants argue that a backplane is necessarily "in the back of communications equipment."  But nothing in the specification suggests that the "backplane" must be in a particular

location, and Defendants cite no specification support for this aspect of their proposal. Defendants provide definitions of the separate word "back" even though the term being construed is "backplane" and ***none*** of Defendants' own extrinsic definitions of ***backplane*** reference a particular physical location. The concept of a backplane is fundamentally about facilitating interconnection, and its physical location is irrelevant to the claims' patentability.

### 4. Defendants' Sur-Reply Brief

It is not sufficient to conclude that "backplane[s] furnish interconnections." Such a construction collapses any distinction between backplanes and traces/lines, which also connect the modules according to the claim language. '369 patent, Abstract; 1:32-33; 1:61-67; cls. 1, 5, 8, 10, 15, 21.

The intrinsic evidence confirms that modules are plugged into the backplane and traces are on the backplane. *Id.* Thus, the backplane more than interconnects; it provides a plane or surface *into which* modules plug in and *on which* traces exist. While the claim language clarifies "backplane" is a plane or surface, the use of "back" indicates this plane is also at the back of the communication equipment. Figure 1 further supports this construction, showing the backplane behind the main module and subsidiary modules.

Plaintiff concedes *Ke* is incorporated by reference (*supra* V.C.3, pp. 23-24) and thus part of the intrinsic evidence. *See Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1377-78 (Fed. Cir. 2006) (relying on a patent incorporated by reference to narrowly construe claim terms). *Ke* defines backplanes as printed circuit boards. *Supra* V.C.2, pp. 21-22.

### D. "idle line / idle trace" (claims 1, 4, 7, 15, 18, 20)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| No construction necessary. | "a [trace/line] that is determined to be inactive" |

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Alternatively, plain and ordinary meaning which is a line/trace that is not flooded with traffic. | |

### 1. Corrigent's Opening Brief

The term idle line has a plain and ordinary meaning in the art, which is a line that has spare capacity for testing. Ex. 2, ¶¶28-30. This is confirmed by the specification which states that idle lines are used "without intruding on normal traffic carried by the system's active lines." *Id.*; '369 Patent at 2:26-29. The specification also teaches that lines can be "idle" or not at different times depending on spare capacity of the lines, that is they are not flooded or full with traffic. *Id.*; '369 Patent at 5:26-30. The claim language indicates that "***selecting***" of "idle lines" should occur, and the POSA would understand that such "selected" lines are simply lines that have some capacity for testing consistent with the claim language of the patent.

Defendants again improperly attempt to read in additional limitations not found in the claims. The claims do not recite or require and determining step and selecting an idle line does not require a separate step of determining. Cisco made a similar argument (asserting it was known to be inactive or that there be a "determination" a line is inactive). Ex. 1D at 1. Judge Albright rejected Cisco's attempt to read a determining step into the claims. Ex. 1C at 3.

### 2. Defendants' Answering Brief

The stated purpose of the '369 patent is to test ***idle*** lines and to find "hidden failures" that will not be discovered until the line is utilized. '369 patent, 2:26-29. Indeed "hidden failures" is the title of the patent. Under Corrigent's construction, *any* line that was not "flooded" would meet the construction, regardless of whether it was active or inactive. But if there is traffic on the line, then the failure would not be hidden, which is the purpose of the '369 patent. Corrigent's attempt

to—yet again—delete words it does not like should fail.  Defendants' construction, on the other hand, captures precisely what the patent says about "idle" lines and should be adopted.

Independent claims 1 and 15 each require "select[ing]" lines or traces that are "idle," so that they can be tested.  *Id.*, 7:9-11; 7:14-16; 8:55-58; 8:60-62.  The claim language itself confirms that selecting idle lines is intentional so that the system may look for hidden failures.  If an active line could be selected, then the failure would not been hidden and would render the term "idle" superfluous.  *See Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1391 (Fed. Cir. 2016).

The specification strongly supports Defendants' construction.  The specification differentiates between idle lines/traces and "active" lines/traces.  '369 patent, 2:26-30.  This dichotomy illustrates that idle lines/traces are the opposite of active lines, *i.e.*, idle lines are inactive.  The specification also states that the lines/traces are determined to be idle at the time of selection.  Specifically, the patent states that the "[p]rocessor **42** maintains a database of management information regarding subsidiary modules **24**, including a list of which traces are active, and which are idle.  When a trace changes state . . . processor **42** updates the database accordingly and uses the updated database in carrying out the next cycle of testing."  *Id.*, 6:47-53.  Knowing whether the lines are active or inactive is fundamental to the patent, and Defendants' construction captures that fundamental concept.

Corrigent's construction—designed to allow it to accuse any system that tests connections between devices regardless of whether the connecting lines are idle or not—turns the patent and claim language on its head and should be rejected.  Under Corrigent's construction, the jury might incorrectly conclude that a system that tests *all* lines may be infringing so long as some of the lines turn out to have been idle.

In addition, Corrigent's construction that the plain and ordinary meaning of "idle line/trace" is a line/trace that "has spare capacity for testing" is contrary to the plain and ordinary meaning of "idle." Ex. A (Michalson) ¶¶ 37-40. For example, the Collins English Dictionary defines "idle" as "unemployed or unoccupied; inactive." Ex. B at 768. Webster's Dictionary similarly defines "idle" as "not working or active." Ex. C at 951. Corrigent's construction removes the ordinary meaning of "idle" entirely and divorces the term from the purpose of the invention. *See* '369 patent, [54], 2:26-29. Defendants' proposed construction, which is consistent with these definitions, should be adopted by the Court.

### 3.  Corrigent's Reply Brief

There is no dispute that an object of the invention is to "provide improved methods and systems for non-intrusive testing." '369 Patent at 1:57-58. The specification teaches failure testing that is non-intrusive and nondisruptive, and that testing should occur on lines that have "spare capacity." *Id.* at 2:26-29, 5:26-30. Such teachings are consistent with Corrigent's proposed construction of "idle line" as being lines that have spare capacity for testing. The court in *Corrigent v. Cisco* already rejected a construction that an "idle line" is "known" to be idle, much like Defendants' proposed construction here that an idle line is "determined" to be idle. Defendants' proposed construction should be rejected again here.

*First*, Defendants argue that the patent's reference to "Hidden Failures" in the title and in certain portions of the specification supports its construction. Defendants cite no authority suggesting that a patent's title is relevant to, much less dictates, a construction of a claim term. Moreover, the POSA would understand that any failure that is as of yet unknown in a networking system is a hidden one, including failures detected on lines with spare capacity. Ex. 4, ¶¶25-27. Additionally, the claim language makes no reference to "hidden failures." Defendants note that

the claim language refers to "selecting" an "idle line," but this says nothing about whether the claims require detection of a particular type of hidden failure.

*Second*, Defendants assert that the specification supports their construction because it allegedly contrasts "idle" lines and "active" lines.  But these disclosures merely relate to a "preferred embodiment of the present invention."  '369 Patent at 6:47-53, 2:48-50.  Indeed, the claim language never contrasts idle and active lines—it does not reference "active" lines at all. Defendants' assertion that "[k]nowing whether the lines are active or inactive is fundamental to the patent" is merely attorney argument that was already rejected in *Corrigent v. Cisco*.

*Third*, Defendants argue that Corrigent's construction is somehow "to accuse any system that tests connections between devices."  But Defendants' assertions are incorrect. The point of the "idle lines" in the patent are to ensure that testing can be conducted in a non-intrusive manner— lines with "spare capacity" fulfill that purpose as the specification confirms.  '369 Patent at 5:26-30.

Defendants ignore that the specification refers to non-intrusive testing where there is "spare capacity," and rely again on extrinsic evidence.  But generic, cherrypicked definitions of "idle" from non-technical dictionaries are irrelevant and do not control over the specification.  *Default Proof*, 412 F.3d at 1302.   Even if considered, one of Defendants' definitions defines idle as "not spent or filled with activity," Ex. C at 951 (entry 2), which is consistent with Corrigent's construction.  Other extrinsic evidence also supports Corrigent's construction, including one of Cisco's networking engineers in the *Corrigent v. Cisco* case who confirmed an "idle line" can be one carrying a "relatively low amount of traffic"—i.e., spare capacity.  Ex. 3E (Ponnapalli) at 54:11–18.  One of the inventors also testified that the '369 Patent relates to failure testing over lines that are "not being used or it's not being fully used," and lines that have "some spare

capacity." Ex. 4E (Bruckman). at 78:6–79:5. Dr. Olivier agrees that the POSA would understand that the plain and ordinary meaning of "idle line" is a line includes spare capacity for testing, consistent with the above disclosures.  Ex. 4, ¶¶28-29.

### 4.  Defendants' Sur-Reply Brief

The '369 patent's purpose is to discover faulty lines that would ordinarily go undetected when not in use. '369 patent, 1:11-24, 2:26-30. In fact, this concept is so fundamental that the patent is titled "*Hidden* Failure Detection." *Id.*, [54]. Similarly, the specification consistently refers to failures of idle components as "*hidden* failures." *Id.*, 1:11-24, 2:26-30. Corrigent improperly ignores this intrinsic evidence. *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) ("a patent's express purpose of the invention informs the proper construction of claim terms"); *Apple Comput., Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) ("[A] claim must be interpreted in light of the teachings of the written description and purpose of the invention.").

Under Corrigent's construction, any line at less than 100% capacity (e.g., 99%) would be considered idle. But failures would be detected on lines in use—even partially—without the need for the self-testing described by the '369 patent. Indeed, the '369 patent aimed to solve the problem of discovering failures only after a line is "actually needed" by detecting hidden failures while components are idle. '369 patent, 1:11-24. Corrigent misstates the usage of "spare" in the specification, which discusses subsidiary modules having spare *lines*—not lines having spare *capacity*. *Id.*, 5:26-31. Finding no support in the intrinsic record, Corrigent relies on extrinsic, non-contemporaneous deposition testimony.

### E.  "a system control processor" (claims 15, 16, 18, 21, 23, 24)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| No construction necessary. | "a processor residing in the main module" |

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Alternatively, plain and ordinary meaning which is system control processor. | |

### 1. Corrigent's Opening Brief

A system control processor needs no construction as it is readily understood by a POSA. Ex. 2, ¶31. To the extent the term needs any construction, it should be given its plain and ordinary meaning which is "a system control processor." Contrary to Defendants' construction, the '369 Patent contains nothing to suggest that the processor must reside in the main module. Defendants rely on preferred embodiments to improperly import limitations from the specification. Such a restrictive read absent a clear intention to limit the claim is inconsistent with basic claim construction principles. *Hill-Rom Servs., Inc.*, 755 F.3d at 1372. Defendants reliance on exemplary descriptions of preferred embodiments is therefore misplaced and improper. Additionally, citations to the claim language do nothing to support the contention that the processor must reside on the main module as the claim language speaks to the role of the system control processor rather than a location. *See e.g.*, '369 Patent at Claims 15-26.

### 2. Defendants' Answering Brief

The intrinsic record demonstrates that the sole embodiment conceived by the inventors— and thus, the invention itself—requires a system control processor that is part of the main module. *See Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1300–02 (Fed. Cir. 1999). The specification describes unequivocally that "[t]he test procedure is supervised by ***an embedded*** system control processor **42** ***in main module*** **22**, in communication with subsidiary processors **44** on subsidiary modules **24** via a separate control channel (not shown) on a backplane **26**." '369 patent, 5:41-45 (emphasis added).



*Id.*, Fig. 1.  This "processor 42," which is in the main module, "selects one of the idle traces to serve as an aid trace 40."  *Id.*, 5:61–63.  The same processor then "instructs processor 44," which are the processors on the subsidiary module, "to loop back all traffic that it receives on trace 40."  *Id.*, 5:66–6:2.  These steps, which are performed by the processor residing in the main module, are the exact same steps recited in claim 15 and 21 being performed by the "system control processor." Thus, the specification confirms that the system control processor must reside in the main module. Accordingly, the Court should adopt Defendants' construction.

### 3.  Corrigent's Reply Brief

Defendants attempt to limit a "system control processor" to a processor that is "in" the main module, but Defendants' only support is based on the embodiment shown in Figure 1. Defendants state that this is the "sole embodiment conceived by the inventors." Corrigent disagrees, but even if true, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to

that embodiment." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Further, while Defendants reference claims 15 and 21, those claims reinforce that that the "main module" and "system control processor" are distinct claim elements that appear in separate limitations as part of a larger "modular electronic apparatus." Ex. 4, ¶ 30. The claims do not state that the system control processor must be within the main module.

### 4. Defendants' Sur-Reply Brief

Corrigent admits that the specification describes that a system control processor is in the main module. *Supra* V.E.3, p. 32. Corrigent's argument that a system control processor may alternatively be located elsewhere finds no support in the intrinsic record, which nowhere suggests that the system control processor can be located anywhere except within the main module. *Supra* V.E.2, pp. 31-32. That claims 15 and 21 mention the main module and system control processor as distinct claim elements does not require they be separate physical elements—the system control processor is still a distinct component even if it is part of the main module. '369 patent, Fig. 1.

### F.    "order of steps" (claims 1, 8, 15, 21)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Not all limitations require an ordering. Those that do are explicit in the claim language used.<br><br>Claims 15 and 21 are not method claims. | The instruct[ing] step must be performed after completion of the first selection; the configur[ing/e] step must be performed after completion of both selections; and the transmit[ting] step must be performed after both selections |

### 1. Corrigent's Opening Brief

The claims have a plain and ordinary meaning, and simply recite various steps that the invention conducts to select ports, link ports, transmit test traffic, and test for failures in a switching system. "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir.

2001). No such order is recited in the '369 Patent. Additionally, it is generally improper to "import a sequential limitation into an apparatus claim." *Creative Internet Advert. Corp.,* 2008 WL 5061625 at *16; *Baldwin*. v, 512 F.3d at 1344.  And as such (1) the steps of the claims at issue can be performed in numerous different orders while achieving the same objectives; and (2) the steps of the claims can be performed continuously and in a near- simultaneous or concurrent fashion. These factors dictate that the claims should be construed as "plain and ordinary meaning," rather than as limited by certain orderings or sequencing of steps.

Two legal principles support Corrigent's argument. *First*, order of steps limitations should not be imposed when "the stated purpose" of an invention "could be achieved" with different orderings. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003). Here, the general purpose of the invention is to use a loopback interface to perform testing between two modules that have been linked together, for the purposes of detecting failures. For example, Claim 1 requires selection of two idle ports (in any order) ([1A] and [1C]), establishing some kind of linkage between the ports [1D], creating a loopback interface [1B], running test traffic between two modules [1E], and reporting failures when traffic does not return to a module in a predetermined time [1F]. The purpose of performing testing could be achieved under numerous orderings and permutations that are not in the order [1A] through [1F]. Ex. 2, ¶¶32-33. For example, it does not matter what order in which the "first" and "second" ports are selected, so steps [1A] and [1C] can occur at numerous points in time; step [1B] (setting up a loopback) can occur at numerous different points in time, as this step is only needed at the point failures are being checked; and step [1D] (linking ports) can occur at any time before test traffic is run. Therefore, steps [1A] through [1D] can occur in numerous different orders in ways that would allow the purpose of the invention (testing for failures in step [1F]) to be achieved.

*Second*, apart from the numerous orders of steps that can be implemented to achieve the purpose of the inventions recited in the '369 Patent, the steps of network testing using software frequently occur simultaneously or near-simultaneously once configured on a switch's operating system or control software. The POSA would understand, for example, that after inputting settings, the operating system of a network switch could be configured to select ports for testing and link the ports simultaneously (selecting and configuring of steps [1A], [1C], and [1D]). Ex. 2, ¶34. It would also be understood that a port and a loopback interface for a module could be configured to be setup simultaneously (selecting and instructing steps [1A], [1B]). Ex. 2, ¶34. It would even be understood that, once the configuration options are set in the system, steps [1A] through [1D] could all occur simultaneously as the user sets up and executes the testing algorithm, with the running of transmission traffic [1E] and reporting of failures in step [1F] occurring almost immediately thereafter. *Id.*[6]

Defendants also argues that its order of steps limitations should be applied to apparatus claims (claims 15 and 21). But its argument is even weaker as to those claims because it is generally improper to "import a sequential limitation into an apparatus claim." *Creative Internet Advert. Corp. v. Yahoo! Inc.,* 2008 WL 5061625, at *16 (E.D. Tex. Nov. 24, 2008); *Baldwin Graphic Systems, Inc. v. Siebert, Inc*., 512 F.3d 1338, 1344 (Fed. Cir. 2008) (holding that claims not limited "to any particular sequence" in an apparatus claim, and noting that "[c]ourts must generally take care to avoid reading process limitations into an apparatus claim"). The apparatus claims recite structural components, not steps, and the only component relevant to the steps discussed by Defendants is "a system control processor, which is operative" to perform

---

[6] Although Judge Albright in the Cisco case construed the claims to require an order of steps, Corrigent maintains that no order of steps is required.

functionality related to the implementation of testing. '369 Patent at 8:55-9:5 ("system control processor" limitation of claim 15); 9:41-10:16 ("system control processor" limitation of claim 21). Whether an apparatus's "system control processor" is "operative" to implement a particular testing algorithm is a separate question from whether method steps are performed in a particular order. The relevant question for the apparatus claims is simply what the processor is "operative" (or capable of being configured) to implement the testing. The ordering of steps inquiry is therefore entirely different for the apparatus claims and should be rejected for this additional reason.

### 2.   Defendants' Answering Brief

Each independent claim of the '369 patent requires six steps, some of which must occur in a particular order according to the claim language, and a court's claim construction must require that order mandated by the language of the claims. *See Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (finding an "ordering requirement" when steps refer back to results of previous steps); *Techno View IP, Inc. v. Oculus VR, LLC*, No. CV 17-386-VAC-CJB, 2018 WL 4141032, at *2-3 (D. Del. Aug. 30, 2018) (same). Here, certain later steps in the claim rely upon the results of previous steps. Claim 1 of the '369 patent recites:

[1A]          selecting a first idle line among idle lines connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid line;

[1B]          instructing the first subsidiary module to loop back traffic reaching the first subsidiary module via the aid line;

[1C]          selecting for testing a second idle line among the idle lines connecting the second subsidiary module to a second port of the switch on the main module;

[1D]          configuring the switch to link the first and second ports;

[1E]          transmitting test traffic over the second idle line from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid line connecting to the first subsidiary module; and

[1F]          reporting that a failure has occurred if the test traffic does not return to the second subsidiary module within a predetermined period of time.

(colored annotations added).

Three ordering requirements are apparent from this claim language and reflected in Defendants' proposal. The selecting step [1A] selects a first idle line connecting the first subsidiary module to "a first port of the switch" to act as an "aid line." The instructing step [1B] then instructs the first subsidiary module to loop back traffic on "the aid line," which was selected in [1A]. Thus, the instructing step [1B] must take place only after the first selection [1A]. Ex. A (Michalson) ¶ 44.

The second selecting step [1C] selects "a second idle line" connecting a second subsidiary module to "a second port of the switch." The configuring step [1D] then uses the first and second ports selected in steps [1A] and [1C] and connects the ports on the switch. Thus, the configuring step [1D] must take place only after the first and second selections [1A] and [1C]. Ex. A (Michalson) ¶ 45.

The transmitting step [1E] transmits traffic over "the second idle line" through the switch and over "the aid line," which were selected in steps [1C] and [1A] respectively. Thus, the transmitting step [1E] must take place only after the first and second selections [1A] and [1C]. Ex. A (Michalson) ¶ 46.

This claim language is unequivocal and dispositive. When one claim limitation utilizes the results of a previous step, the claim must be construed to require the previous step to be performed first. *Wi-LAN*, 811 F.3d at 462; *Techno View IP*, 2018 WL 4141032, at *2-3. Defendants do not seek to require *all* of the steps to be performed in order. Defendants' construction imposes an order merely on those limitations that explicitly refer back to the results of a previous step. Ex. A (Michalson) ¶ 48. Similarly, steps that explicitly refer back to the results of a previous step or steps cannot be performed simultaneously for the same reasons. *Id.* ¶ 49.

Furthermore, apparatus and system claims can require an order of steps when they are similar to the method claim. *See Avago Techs. Gen. IP (Sing.) Pte Ltd. v. Asustek Comput., Inc*., No. 15-CV-04525-EMC, 2016 WL 3029674, at *12 (N.D. Cal. May 27, 2016) (noting case law supporting, and absence of any case law refuting, that "order can be required by a system/apparatus claim"); *Maxim Integrated Prods., Inc. v. Silicon Mitus Tech., Inc*., No. 17-CV-03507 NC, 2018 WL 4657384, at *9 (N.D. Cal. July 3, 2018) (collecting cases). Here, method claim 8, and apparatus claims 15 and 21 contain virtually identical limitations to [1A], [1B], [1C], [1D], [1E] and [1F], including the same referential language back to the prior steps. Ex. A (Michalson) ¶ 50. In addition to the language of the claims, every embodiment discussed in the specification requires the same order, which confirms the order required by the claims. *See Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1400 (Fed. Cir. 2014) (noting order of steps "is consistent with the sole embodiment in the specification").

This term was argued in the Cisco case, and Judge Albright agreed with Cisco's construction. *See* Ex. E. For the reasons above, each of the claims should be construed in accordance with Defendants' proposed construction.

### 3. Corrigent's Reply Brief

Corrigent maintains that the claim language speaks for itself, and that the claim elements of this claim term do not necessarily require an ordering.

*First*, with regard to all of the claims, Defendants' do not dispute that some of the steps of the patent could occur simultaneously or near-simultaneously. In particular, Dr. Olivier explained that the selecting and configuration steps could occur simultaneously in the context of the types of control software that is used on routers and switches. *See supra*, citing Ex. 2, ¶34. The claim language merely refers to steps that should be carried out to perform the claimed failure testing,

and does not proscribe a particular order that the steps must occur.  Ex. 4, ¶¶ 31-32.  Defendants'

conclusory argument to the contrary ignores how software works.

   *Second*, in any event, the Court should not impose an order of steps on the apparatus claims.

Defendants ignore both *Creative Internet* and *Baldwin Graphic Systems*, which support Corrigent,

and Defendants cite no Federal Circuit decision that supports imposing an order of steps on

apparatus claims. Defendants also do not dispute that the system claims are directed to computer

processing systems (including a "system control processor") that are "operative" to perform certain

functionality, underscoring that any order of steps is irrelevant. *Id.*   Defendants cite *Maxim

Integrated Products*, but ignore Maxim's concession that "the order of steps does not typically

apply" to apparatus claims. 2018 WL 4657384, at *9 (N.D. Cal. July 3, 2018).

### 4.  Defendants' Sur-Reply Brief

   The claim language requires certain steps be completed before the performance of later

steps as proposed by Defendants. *Supra* V.F.2, pp. 35-38. Corrigent's argument that the steps can

occur simultaneously is unsupported by the intrinsic record. *Supra* V.F.3, p. 38. Moreover,

"conclusory, unsupported assertions by [its] expert[]...are not useful to a court" and should be

disregarded. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). The specification

discloses a sequential process consistent with the claim language. *See generally* '369 patent.

Certain steps rely on the outcome of previous steps, and thus it would be impossible for the steps

to be performed simultaneously. *Supra* V.F.2, pp. 35-38.

   Corrigent also argues that the order of steps does not apply to the apparatus claims. *Supra*

V.F.3, p. 38. However, many courts since *Creative Internet Advertising Corp. v. Yahoo! Inc.*, 2008

WL 5061625, at *16 (E.D. Tex. Nov. 24, 2008), have held that courts can "impose such a

sequential order on an apparatus claim when the claim language contemplates and explicitly

describes a sequential process, or when the disclosed system performs essentially similar steps as a method claim." *See, e.g., Maxim Integrated Prods., Inc. v. Silicon Mitus Tech., Inc.*, 2018 WL 4657384, at *9 (N.D. Cal. Jul. 3, 2018); *WSOU Investments LLC v. Dell Techs. Inc.*, No. 6:20–cv–00476-ADA, slip. op. at 9 (W.D. Tex. May 27, 2021); *Avago Techs. Gen. IP (Sing.) Pte Ltd. v. Asustek Comput., Inc.*, 2016 WL 3029674, at *12 (N.D. Cal. May 27, 2016); *Motorola Mobility, Inc. v. Microsoft Corp.*, 2012 WL 12519819, at *25 (W.D. Wash. June 4, 2012). Corrigent's reliance on *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, is misplaced, because those were "pure apparatus claims" with "no process limitations." 512 F.3d 1338, 1344 (Fed. Cir. 2008). Here, the claims recite process steps. *Supra* V.F.2, pp. 37-38.

## VI.    CLAIM CONSTRUCTIONS OF THE '400 PATENT

### A.    "said FDB" (claims 1, 11)[7]

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Not Indefinite.<br><br>Alternatively, plain and ordinary meaning which is said FDB of said first line card. | Indefinite. |

### 1.    Corrigent's Opening Brief

The POSA reading the claims in light of the specification and intrinsic record would have understood the "said FDB" claim language to have been reasonably certain because it simply refers to the FDB of the first line card. Ex. 2, ¶¶42-45.

The claims recite that "each of said member line cards [includes] a respective forwarding database (FDB)." After introducing that each member line card includes an FDB, "said FDB" is

---

[7] Defendants propose construing "said FDB" as the term appears in the claim limitation "if said MAC destination address does not appear in said FDB, flooding said data packet" for claim 1, and as the term appears in the claim limitation "when said MAC destination address does not appear in said FDB, to flood said data packet" for claim 11.

recited three times in each of independent claims 1 and 11. In two of those three instances, the claims explicitly state "said FDB *of said first line card*." In the third instance, relating to the MAC destination address checking, "of said first line card" is not recited. However, in view of the context of the remainder of the claim, "said FDB" is not indefinite as the POSA would have been reasonably certain that "said FDB" is "said FDB of said first line card."

Cisco similarly argued that "said FDB" was indefinite—Judge Albright, however, found that "said FDB" was "[n]ot indefinite," and instead that the term should be afforded its "plain and ordinary meaning, wherein 'said FDB' means 'said FDB of said first line card.'" Ex. 1C at 4.

## 2. Defendants' Answering Brief

All of the asserted claims are indefinite because they recite multiple "FDBs" and later ambiguously refer to "said FDB," without clarifying to which one of the previously recited FDBs it refers. *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020) (affirming the district court's indefiniteness holding because the claim term had multiple plausible interpretations). For example, claim 1 recites:

> configuring a network node having a plurality of ports, and *at least first and second line cards* with respective first and second ports, to operate as a distributed media access control (MAC) bridge in a Layer 2 data network;

> configuring a link aggregation (LAG) group of parallel physical links between two endpoints in said Layer 2 data network joined together into a single logical link, said LAG group having a plurality of LAG ports and *a plurality of conjoined member line cards*;

> providing for *each of said member line cards a respective forwarding database (FDB)* to hold records associating MAC addresses with ports of said plurality of ports of said network node;

> \*       \*       \*

> if said MAC destination address does not appear in *said FDB*, flooding said data packet via one and only one LAG port of said plurality of LAG ports;

> checking said MAC source address of the data packet against records in *said FDB of said first line card* . . . .

(colored annotations added).

The claim thus recites two sets of line cards: (1) "first and second line cards" and (2) "a plurality of conjoined member line cards."  The claim then requires that "each of said *member line cards*" (not the first and second line cards) has "a respective forwarding database (FDB)."  Next, the claim recites checking "said FDB," without specifying to which of the FDBs on the plurality of member line cards it refers.[8]  A POSITA would not have understood to which of the multiple FDBs the claim refers.  Ex. A (Michalson) ¶¶ 51-52.

Looking at the rest of the intrinsic record only compounds the ambiguity.  For example, claim 1 elsewhere recites "said FDB of said first line card," ***but the claim never recited an FDB on the first line card***.  '400 patent, cl. 1.  If the claimed first and second line cards also have FDBs even though they are not recited in the claims, there are even more possible FDBs to which the earlier-claimed "said FDB" could refer in addition to the recited FDBs that reside on the plurality of member line cards.  A POSITA would therefore have no idea to which of the claimed (or unclaimed) FDBs the "said FDB" refers.  Ex. A (Michalson) ¶ 53.

Claim 11 is likewise indefinite.  Unlike claim 1, claim 11 recites that the "first and second line cards" are a part of the plurality of member line cards.  Claim 11, however, still ambiguously recites "said FDB" without clarifying whether it is referring to the FDB on the first line card or the FDB on the second line card.  *See* '400 patent, cl. 11 ("when said MAC destination address does not appear in ***said FDB***, to flood said data packet via one and only one of said LAG ports"); Ex. A (Michalson) ¶ 54.

---

[8] The reference "said MAC destination address" does not provide any clues because that refers to the MAC address of the sender of the data packet, not one of the line cards on the node.

The Federal Circuit affirmed indefiniteness of a similar term in *Bushnell Hawthorne*, 813 F. App'x at 526. There, the claim recited three sets of IP addresses. Later in the claim, the patent used the term "said different IP address," which lacked an antecedent basis. The Federal Circuit explained that, "[w]ith three different IP addresses to choose from, a [POSITA] faced with the 'said different IP Address' limitation is left to wonder which of the different IP addresses is 'said' different one." *See id*. The exact same thing is true here. There are at least two—and possibly many more that are unrecited—different possible "FDBs" to which the term "said FDB" could refer. "A [POSITA], faced with the claims and the specification, could not, with reasonable certainty, discern the meaning of the claim term." *Id*., 527. This Court has also construed similar terms as indefinite. *See, e.g.*, *Collabo Innovations, Inc. v. OmniVision Techs., Inc.*, No. CV 16-197-JFB-SRF, 2017 WL 3670661, at *8 (D. Del. Aug. 25, 2017) (determining that "the first active region" was indefinite when there were a plurality of active regions recited in the claims).

Defendants therefore respectfully request "said FDB" be found indefinite, consistent with Federal Circuit and this Court's precedent.

### 3. Corrigent's Reply Brief

Claim 1 can be generally divided into two groupings of steps: steps [1A] through [1C] articulate a configuration in which the novel method of MAC synchronization and learning is implemented; and steps [1D] through [1H] describe the claimed data packet flow and implemented MAC synchronization and learning. Ex. 4, ¶40. The specification and claims describe that each line card has a forwarding database (FDB). *See e.g.*, '400 Patent, Abstract and 3:7–10. Both independent claims recite "said FDB" three times in the data packet flow/MAC address checking part of the claims. While the claims explicitly recite "said FDB *of the first line card*" twice, the claims leave out the "of the first line card" language in the MAC destination address checking step

([1F]). However, based on the context of the claims a whole, it would be apparent to the POSA that "said FDB" of [1F] has the same antecedent object as the other mentions of "said FDB" in [1G] and [1H], *i.e.,* said FDB is also "said FDB of the first line card." *See* Ex. 2, ¶43–44.  It is well-established that the words of a claim "used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998).

Defendants selectively quote and overcomplicate the plain language of the claims in order to argue that a POSITA would have no idea what said FDB refers to. For example, Defendants incorrectly assert that the claims require two distinct "sets of line cards" and that only the "member line cards" include FDBs. But nothing in the claim language requires or supports these contentions. Ex. 4, ¶¶41–42. Defendants' position is a litigation-driven attempt to sow confusion by making it seem like the claims require some unknown large number of line cards and FDBs, such that the POSA has no idea which of the FDBs is the claimed "said FDB." But that is not the case as the claim elements [1F]–[1H] only recite one specific FDB.

Defendants rely on *Bushnell*, but the claims at issue in *Bushnell* are easily distinguished from the claims here. There, the claim recited three distinct sets of IP addresses as specific objects of claimed actions:

> …one or more *IP Addresses* for… ,
> …one or more *second IP Addresses* for…,
> …one or more *third IP Addresses* if…

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 523 (Fed. Cir. 2020) (emphasis added). The challenged-claim later introduced a processor that "analyzes a request submitted to *said different IP Address*." *Id.* (emphasis added). The Federal Circuit explained that the claims recite "three classes of IP addresses prior to the 'said different IP Address' limitation," each of

which has a separate meaning. *Id.* at 526. Thus, it was "entirely unclear" which of those three claimed IP addresses in the earlier portion of the claim is being referenced in the later portion. *Id.* *Collabo* is similarly distinguishable. There, the claims recited "a corresponding active region of the semiconductor substrate" and then later "the first active region," without any information about which active region is the "first." *Collabo Innovations, Inc. v. OmniVision Techs., Inc.*, 2017 WL 3670661, at *8–9 (D. Del. Aug. 25, 2017). As this Court explained, the plaintiff's proposed construction to fix the indefiniteness would "require the court to ignore portions of the claims and define the term in a manner inconsistent with both its ordinary meaning and the intrinsic record." *Id.* at 9.

Here, Corrigent's construction is consistent with the term "said FDB" use throughout the claim. There are not separately claimed forwarding databases—just the description that each of the member line cards of the node have an FDB ([1C]). Unlike the unclear "*different* IP address" or "*first* active region" terminology, after introducing that the line cards each have an FDB, a single, particular "said FDB" is recited throughout the remainder of the claims. Thus, the POSA would understand that the claimed "said FDB" in the data flow portion of the claims ([1D] through 1[H]) is the same FDB throughout, which is the FDB "of the first line card." Ex. 4, ¶¶50–52.

Additionally, the context of "said FDB" as part of the MAC destination address checking would be helpful to the POSA's understanding. *See* Ex. 4, ¶50. In *Bushnell*, the Federal Circuit found the context of the claim "compounds the problem." 813 F. App'x at 536. In *Collabo*, there was no ordinal language elsewhere in the claims that provided context as to which active region was the "first." Here, the context is insightful because the POSA would recognize the difference in the network node configuration ([1A]–[1C]) and the data packet flow through the network node ([1D]–[1H]). *See* Ex. 4, ¶¶40, 50. Defendants brush off the context "'said MAC destination

address' does not provide any clues because that refers to the MAC address of the sender of the data packet." But this makes no sense—the POSA would understand that the claimed *destination address* does not "refer[] to" the *sender* of the packet but the address of the destination of the data packet. *Id.*, ¶51. As noted above, the POSA would understand that the particular FDB identified in the data flow portion of the claim is the same FDB throughout. *Id.*, ¶52.

Additionally, neither the Defendants nor their experts found the claims "hopelessly indefinite" in the multiple IPR proceedings they filed against the '400 Patent, including the allegedly indefinite "said FDB" term. Ex. 3A at 24–25; Ex. 3B, at ¶¶114–116; Ex. 3C at 28; Ex.4D at ¶¶131–133. In fact, neither Defendant suggested that the PTAB needed to construe *any* terms for the purposes of determining validity over the asserted prior art references. Ex. 3A at 7–8; Ex. 3C at 5. But now, Defendants' position is that a POSA cannot understand the scope of claims 1 or 11 with reasonable certainty because of its use of "said FDB." Defendants cannot have it both ways.

Because a prior art rejection cannot be sustained if the POSA cannot ascertain the scope of the claims, the PTAB will only undertake anticipation or obviousness analyses if the challenged claims satisfy the definiteness requirement. *Blackberry Corp. v. MobileMedia Ideas, LLC*, IPR2013-00036, Paper 65, at 8 (PTAB Mar. 7, 2014) (citing cases); *see also Apple Inc. v. Valencell, Inc.*, IPR2017-00319, Paper 10, at 12-14 (PTAB June 12, 2017). The Federal Circuit has instructed that if the PTAB cannot ascertain the scope of a claim with reasonable certainty, the PTAB should not go forward on answering questions of patentability under sections 102 or 103. *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1353 (Fed. Cir. 2020); *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1379 (Fed. Cir. 2017) (reversing district court's finding of indefiniteness and noting "[n]o one involved in either the first or the second

reexamination had any apparent difficulty in determining the scope of [the claim term at issue]"). The PTAB was able to understand the claims with reasonable certainty in rejecting both Dell and Arista's IPRs.

### 4. Defendants' Sur-Reply Brief

Regardless of how Corrigent parses the claim, "said FDB" as recited in 1[f] and 11[d] is indefinite. Ex. J (Michalson Supp.) ¶¶ 10-14. The fact is that the claims recite multiple line cards, and each line card has its own FDB. As a result, it is unclear to which of the multiple FDBs "said FDB" refers.

As even Corrigent acknowledges, claims 1 and 11 both recite, on multiple instances, "said FDB *of said first line card*," because the patentee knew there was more than one possible FDB and it was important to specify which FDB was being referenced. Corrigent argues that "said FDB" in 1[f] must be the same "said FDB of said first line card" recited later in the claim; however, the only possible antecedent basis for "said FDB" in 1[f] is in 1[b]/1[c] reciting "*a plurality of conjoined member line cards...; ...each [having]...**a respective forwarding database (FDB)**.*" Corrigent's assertion that "said FDB" could somehow find antecedent basis in the claim limitations that come *after* it finds no support in the case law. *Supra* VI.A.4, p. 43.

The indefiniteness of this term is further highlighted in Corrigent's proposed construction. By construing "said FDB" to be "said FDB of said first line card," Corrigent has rewritten the claims so that they no longer make any sense. In 1[e], the claim requires conveying the data packet to the first line card for transmission to the destination MAC address. And 11[d] expressly recites "the *ingress line card* conveys said data packet via said switching core to at least *said first line card*." Because the first line card must be the egress line card, 1[f] and 11[d] now require checking the MAC destination address in the FDB of the egress line card under Corrigent's proposed

construction. Ex. J (Michalson Supp.) ¶¶ 8–9. But by the time the data packet reaches the egress line card, the data packet has already been routed and has reached the egress line card for "transmission to said MAC destination address" as recited in 1[e]. There would be no need to check the egress line card's FDB at this point. *Id.* This absurdity is the result of Corrigent's proposed construction, which Corrigent wholly fails to acknowledge and "would require the court to...define the term in a manner inconsistent with...the intrinsic record." *Collabo Innovations, Inc. v. OmniVision Techs.*, Inc., 2017 WL 3670661, at *9 (D. Del. Aug. 25, 2017).

Corrigent finally argues that Defendants understood the term enough to argue invalidity in an IPR. *Supra*, VI.A.4, p. 46, 11. But Defendants' position in the IPR was that the claims are invalid as obvious under any interpretation, not that the term was sufficiently definite. Indeed, Defendants are not permitted to raise indefiniteness before the Board.

### B. "virtual media access control (MAC) bridge" (claims 8, 11, 18)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Not Indefinite.<br><br>Alternatively, plain and ordinary meaning which is a media access control (MAC) bridge that serves a virtual private network (VPN) instance | Indefinite. |

#### 1. Corrigent's Opening Brief

The POSA would understand the meaning of "virtual media access control (MAC) bridge" with reasonable certainty in the context of the claims and specification of the '400 Patent. Ex. 2, ¶¶46-48. The term "virtual MAC bridge" is recited as part of independent claim 11, and dependent claims 8 and 18. In dependent claim 8, the claim language describes that "the network node [can be] configured to operate as multiple virtual MAC bridges in a Layer 2 virtual private network, *wherein each virtual MAC bridge is configured to serve a respective VPN instance*." '400 Patent

at 11:65-12:5 (emphasis added). Substantially identical language appears in the specification, and states that "*each virtual MAC bridge is configured to serve a respective VPN instance*." *Id.* at 4:54-64 (emphasis added). Additionally, such virtual bridges or switches were well-known and had a well-understood meaning to a POSA at the relevant time. *See* Ex. 2, ¶48, Ex. 2C at 1, 4. As such, Corrigent submits this term is not indefinite.

### 2.  Defendants' Answering Brief

The intrinsic record gives no guidance as to the proper scope of "virtual media access control (MAC) bridge." Because the intrinsic record "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of" this term, it is indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

As an initial matter, the term "virtual MAC bridge" does not have a well-understood or common meaning in computer networking. Ex. A (Michalson) ¶ 56. Instead, it appears to be a coined term specific to this patent so its meaning must come from the intrinsic record. *See Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019).

The claim language itself does not provide any objective boundaries to "virtual MAC bridge." To the contrary, the claims separately claim a "***distributed*** [MAC] bridge" (claim 1) and "***virtual*** [MAC] bridge" (claim 11), which are presumed to have different meanings. *See Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). Indeed, claim 8 further limits the claim by reciting "the network node is configured to operate as ***multiple virtual MAC bridges*** in a Layer 2 virtual private network (VPN), wherein ***each virtual MAC bridge*** is configured to serve a respective VPN instance." '400 patent, cl. 8. This narrower definition appears to be Corrigent's claim construction proposal. *See supra* VI.B.1, pp. 48-49. However, while this suggests that there could be multiple "virtual MAC bridges" in a network node, a

POSITA would still not understand the objective boundaries of a "virtual MAC bridge," and Corrigent's construction simply recites a function of the "virtual MAC bridge" without defining it.  Ex. A (Michalson) ¶¶ 57-58.

The specification likewise provides no guidance, only reciting that the nodes may operate as a "virtual MAC bridge" without explanation.  '400 patent, 3:3-7, 4:54-60, 5:11-18.  And nothing in the file history clarifies the scope of "virtual MAC bridge."

The Federal Circuit has affirmed indefiniteness in similar situations.  In *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900 (Fed. Cir. 2020), the Court held that the term "magnetic fuzz" was indefinite because the specification lacked "a meaningful description of what constitutes magnetic fuzz" such that a POSITA would not know "when it is present and how to address it."  *Id.* at 906.  The "patentee cannot simultaneously use non-modal verbs to avoid limiting the scope of an invention while also arguing that those same examples define the limits of the invention."  *Id.*  Like in *IQASR*, the asserted patent includes open-ended, non-limiting examples of how a "virtual MAC bridge" could be set up that do not provide any objective boundaries.  Thus, Defendants request "virtual MAC bridge" be found indefinite.

### 3.  Corrigent's Reply Brief

The POSA would have no uncertainty as to the meaning of the term "virtual MAC bridge" in the context of the '400 Patent. *See* Ex. 2, ¶47. Defendants simply ignore the perspective and knowledge of the POSA and the patent's disclosure. Defendants incorrectly argue that "virtual MAC bridge" is a term coined by the inventors. But the patent does not coin or specifically define a new term.  To the contrary, the patent provides various implementations and accompanying descriptions of MAC bridges being implemented in virtual networks, including VPNs, which would all provide context to these terms. *See* Ex. 4, ¶¶54–55.

The claims do not use "virtual MAC bridge" in isolation but in the context of the network node operating as a virtual MAC bridge in a Layer 2 data network, or more particularly, a Layer 2 VPN. '400 Patent, claims 8, 11, 18; Ex. 4, ¶54. MAC bridges, VPNs, VLANs, VPLS, and virtual bridges/switches are disclosed throughout the patent,[9] including that "MAC bridges maintain a forwarding database (FDB) to map destination MAC addresses of the packets they receive to bridge ports." '400 Patent, 1:33–35. The invention is described as relating "to methods and systems for *bridging in virtual* private LAN services (VPLS) and other distributed bridging systems." *Id.*, 1:7–9 (emphasis added). The '400 Patent continues with various descriptions of virtual bridges and networks:

- "Every node in a VPLS acts as a *virtual bridge*. A virtual bridge node has 'virtual ports,' which are the endpoints of PWs that are part of the VPLS." 2:22–25.

- "These methods are useful especially in the context of nodes that are configured to serve as *virtual bridges in Layer 2 virtual private networks*." 2:62–66.

-  "*A Layer 2 VPN, in the form of a VPLS*, is provisioned in system 20 so as to connect MAC user terminals." 5:53–56.

The '400 Patent also describes how "a given VPLS instance may be partitioned into a number of virtual LANs (VLANs), which generally operate in the manner defined in the above-mentioned IEEE Standard 802.1Q." '400 Patent, 7:5–8. IEEE 802.1Q, a well-known standard cited in the patent, is titled "Virtual Bridged Local Area Networks" and "specifies a general method for the operation of MAC Bridges that support the construction of VLANs." Ex. 4A, pg. 1; *see also*

---

[9] The POSA would also be knowledgeable and familiar with VPNs, VLANs, VPLS, and virtual bridges/switches. Ex. 4, ¶55.

Ex. 4B, at 26, 28, 31 (cited in the '400 patent at 2:9–11 and describing a virtual switch instance in a virtual network).

Defendants' reliance on *IQASR LLC v. Wendt Corporation* is misplaced. There, the Federal Circuit found that the district court did not clearly err "in finding that 'magnetic fuzz' lacked an ordinary and customary meaning in the art at the time of the invention." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020). The Federal Circuit found that the specification consisted of "multiple layers of definitions [that] are all open-ended and non-limiting," and thus, "a skilled artisan must wade through a morass of uncertainty and contradiction to get to this point. It is this word salad of inconsistent indirect definitions and examples that so flummoxed the district court." *Id.* at 905. There is no "morass of uncertainty and contradictions" regarding a "virtual MAC bridge."

Defendants, in fact, had no problem identifying alleged "virtual MAC bridges" in their IPR petitions in which they presented arguments, for example, that the "Zelig" reference discloses the claimed "virtual media access control (MAC) bridges." Ex. 3A at 60; Ex. 3B at ¶¶94–95, 184–185; Ex. 3C at 62–63; Ex. 3D at ¶¶110–111, 206–207. Defendants make no attempt to describe how something would be obvious to the POSA but also that the POSA would have no reasonable certainty in understanding the very same thing.

Corrigent maintains that no express construction is necessary. To the extent the Court believes a construction is necessary, however, Corrigent submits that a virtual MAC bridge is a MAC bridge that serves a virtual private network (VPN) instance. '400 Patent, 4:54–64; Ex. 2, ¶¶47–48.

### 4. Defendants' Sur-Reply Brief

Corrigent argues that "virtual MAC bridge" should mean "media access control (MAC) bridge that serves a virtual private network (VPN) instance." *Supra* VI.B.3, p. 52. Corrigent relies exclusively on (1) the wherein clause from claim 8 and (2) excerpts from the specification that define VPN and VPLS. *Id.* However, neither provides a definition for "virtual MAC bridge." First, if the term itself had the same meaning as the language in the claim, then the "wherein" clause would be redundant. Such an interpretation cannot be correct. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012). Second, the definition of VPLS or VPN from the specification is equally unhelpful because those terms are separately recited in the claims, and "[d]ifferent claim terms are presumed to have different meanings." *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008). Corrigent fails to meaningfully distinguish *IQASR* except to say that there is no uncertainty with "virtual MAC bridge." *Supra*, VI.B.2, pp.51-52. But as Defendants have shown, this is not a term used in the industry, and as a coined term, the patent fails to provide any guidance for a POSA to reasonably ascertain the scope of the term. Ex. J (Michalson Supp.) ¶¶ 15–18; *supra* VI.B.2, pp. 49-50.

Corrigent again argues that Defendants understood the term enough to argue invalidity in an IPR. *Supra* VI.B.3, p. 52. But, as argued above, the claims are invalid as obvious under *any* interpretation.

### C. "order of steps" (claims 1, 11)

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Not all limitations require an ordering. Those that do are explicit in the claim language used. | The step of conveying the data packet to the first line card (1[e]) must be performed before the FDB [of the first line card] is checked (1[f]) and the source MAC address is checked (1[g]). And 1[g] must be |

| Corrigent's Construction | Defendants' Construction |
|---|---|
| Nothing in Claim 1 requires 1[e] to happen before 1[f] or before 1[g], nor 1[f] before 1[h].<br><br>Claim 11 is not a method claim. | performed before the record is added to the FDB (1[h]).[10] |

### 1. Corrigent's Opening Brief

Claim 1 of the '400 Patent does not specifically recite or require the particular order of steps Defendants advocate. It is a basic tenet of claim construction that method claims are generally "not limited to performance of the steps in the order recited." *Baldwin*, 512 F.3d at 1345. Moreover, claim 11 is an apparatus claim, and as provided above, it is generally improper to "import a sequential limitation into an apparatus claim." *Creative Internet*, 2008 WL 5061625, at *16 (E.D. Tex. Nov. 24, 2008).

Steps [1E] through [1H] generally describe three *separate* operations:

- internal flow of a received data packet (step [1E]),

- MAC destination address checking and certain conditional resulting actions (*i.e.*, flooding; together, step [1F]), and

- MAC source address checking (step [1G]) and certain conditional resulting actions (*i.e.*, MAC learning, step [1H]).

The independence of these steps from one another is illustrated by the face that step [1F] can be moved "up" in the claim to read before [1E] without the POSA losing any context or understanding. Similar is true for moving steps [1G] and [1H].

Defendants make two incorrect arguments: first, that the claims require the internal flow or conveying operation, step [1E] to occur before both MAC address checking operations ([1F] and [1G]); and second, that the claims require the MAC destination checking [1F] to occur before

---

[10] To narrow the disputes, Defendants modified the construction to only require that 1[g] must be performed before 1[h].  Defendants note that the similar steps in claim 11 should follow the same order.

MAC source address learning [1G]. However, the plain language of the claims does not require, explicitly or implicitly, the Defendants' suggested ordering of steps.

The first error is that nothing in claim 1 requires conveying ([1E]) to occur before either MAC destination address checking ([1F]) or MAC source address checking ([1G])—in fact, there is no sequential language providing any explicit ordering of the three operations identified. Ex. 2, ¶¶51, 53. A construction requiring [1E] to occur before [1F] is inconsistent with the claim language, specification, and counterintuitive from the perspective of a POSA.  *Id.*, ¶¶51–52. Indeed, as Dr. Olivier explains, under Defendants' proposal, how would the system know where to "convey" the received data packet if the MAC *destination* address is not checked before the conveying? *Id.*, ¶52. The claim language in [1E] plainly considers that the flooding described in [1F] my occur before [1E], and thus the conveying is to "*at least* said first line card." Moreover, the specification describes an embodiment that Defendants' proposal directly contradicts. *See id.*, ¶51 (citing '400 Patent, at 1:38–40, 3:10–16, and 7:26–30).

Similarly, steps [1G] and [1H] disclose a MAC source address learning and synchronization/learning process which is distinct from the MAC destination lookup/forwarding process recited in steps [1E] and [1F]. *See id.*, ¶53. Thus, the POSA would understand that MAC source address learning may occur before [1E]. *Id.*, ¶53–54.

Finally, Defendants seek to relate the MAC *destination* checking of [1F] with the conditional MAC *source* address functions provided in [1H]. There is no support for this position in the '400 Patent, as the MAC source address learning of [1H] is completely unrelated to the MAC destination checking of [1F]. *Id.*, ¶55.

### 2.  Defendants' Answering Brief

The claim language and the specification compel the Defendants' proposed construction

that the steps of the claim occur in the order recited.  Ex. A (Michalson) ¶¶ 61-65.  Corrigent's proposal that "not all limitations require an ordering" improperly ignores the logical progression clearly dictated by the claims.  Moreover, Corrigent's proposal that the steps that are required to be performed in order "are explicit in the claim language used" provides no information on what limitations Corrigent believes explicitly provides an order.

The steps of a method claim must occur in order "when the method steps implicitly require that they be performed in the order written."  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  For example, when a subsequent step references something that logically indicates a prior step has been performed, "the sequential nature of the claim steps is apparent from the plain meaning of the claim language."  *See Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998); *see also Citrix Sys., Inc. v. Workspot, Inc.*, No. CV 18-588-LPS, 2020 WL 5634219, at *11 (D. Del. Sept. 21, 2020).  Second, "[i]f not, we next look to the rest of the specification to determine whether it 'directly or implicitly requires such a narrow construction.'"  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d at 1363, 1370 (Fed. Cir. 2003) (citing *Interactive Gift*, 256 F.3d at 1343) (emphasis omitted).  Here, both the claim language and the specification compel a construction that the steps be performed in the order proposed by Defendants.

| | **Claim Language** |
|---|---|
| 1[e] | conveying, by transmitting said data packet to said MAC destination address via said first port, said received data packet in said network node to at least said first line card for transmission to said MAC destination address; |
| 1[f] | if said MAC destination address does not appear in said FDB, flooding said data packet via one and only one LAG port of said plurality of LAG ports; |
| 1[g] | checking said MAC source address of the data packet against records in said FDB of said first line card; and |

| | Claim Language |
|---|---|
| 1[h] | if said FDB of said first line card does not contain a record of an association of said MAC source address with said ingress port, creating a new record of said association, adding said new record to the FDB of said first line card, and sending a message of the association to each member line card of said plurality of member line cards. |

(colored annotations added).

As a matter of logic and grammar, step 1[e] must be performed before 1[f] and 1[g].  Ex. A (Michalson) ¶ 62.  For example, step 1[g] requires checking the MAC source address against the records in said FDB of said first line card.  However, it would be impossible to check the records of the FDB of said first line card before the data packet was conveyed to the first line card (1[e]).  The same rationale applies for 1[f] when checking for the MAC destination address in the FDB of the first line card, which is the construction proposed by Corrigent.  Corrigent argues that an FDB must first be checked in 1[f] **before** the packet is conveyed to the first (or egress) line card.  *Supra*, VI.C.1, 55.  This adds to the confusion with respect to the meaning of "said FDB" in claim 1[f].  *Id.*  If "said FDB" is to be construed as "said FDB of said first line card," as Corrigent suggests, then it follows that 1[e] must be performed before 1[f] because the data packet is not conveyed to the first line card until step 1[e].[11]  However, if Corrigent deems that the data packet could not have been conveyed to the first line card until **after** checking an FDB, then it must check the FDB of the **ingress** line card, which contradicts Corrigent's proposed construction.  This reasonable, alternative construction only serves to underscore the indefiniteness of "said FDB" in claim 1[f].  Setting the indefiniteness issue aside, if the "said FDB" is of the first line card as Corrigent proposes, then step 1[e] must be performed before step 1[f]—the data packet must first

---

[11] The specification does not disclose checking for the MAC destination address on the egress line card, so adopting this construction instead of finding "said FDB" in 1[f] indefinite, would create a written description issue.

be conveyed to the first line card in step 1[e] before the data packet is checked in the FDB of the first line card for steps 1[f] and 1[g].  *Id.*

And 1[g] must be performed before 1[h], which Corrigent does not appear to dispute.  In order to know whether the FDB contains a record of association of the MAC source address and ingress port (1[h]), the FDB must first have been checked in 1[g].  *Id.* ¶ 63.  It would be impossible to know whether the record existed or not as required in 1[h] if the FDB were not first checked in 1[g].  *Id.*

Because "the claim language demonstrates the order of the steps, [the Court] need not look further into the specification."  *See Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021).  Nonetheless, the specification is fully consistent with the order of steps required by the claims.  Ex. A (Michalson) ¶ 64.  As discussed above, the '400 patent delineates between the ingress path and egress path.  *Id.*  The '400 patent explains that "[t]he egress line card (or line cards) that is to transmit the packet onward checks the MAC source address of the data packet against the records in its own FDB," which is step 1[g].  '400 patent, 3:18-20.  "If the FDB of the transmitting line card [*i.e.*, the egress line card] does not contain a record associating the MAC source address with the port of the ingress line card on which the data packet was received, the transmitting line card adds the record to its FDB," which is step 1[h].  *Id.*, 3:20-24.  The data packet is conveyed to the egress line card in step 1[e].  Ex. A (Michalson) ¶ 64.  And because MAC learning specifically occurs on the egress path, the packet must first be conveyed to the egress line card in step 1[e] before the MAC learning steps in 1[g] and 1[h] may occur.  *Id.*  Corrigent's arguments that there is nothing that requires the conveying step (1[e]) to be performed before the MAC learning steps (1[g], 1[h]) is therefore incorrect.  Both the plain language of the claims and the specification compel that the steps occur in the order proposed by Defendants.

Independent claim 11, an apparatus claim, should likewise be construed to require that the steps be performed in the order recited.  *Id.*, ¶ 65.  Steps of an apparatus claim are construed to require an order "when the claim language contemplates and explicitly describes a sequential process," *Motorola Mobility, Inc. v. Microsoft Corp.*, No. C11-1408JLR, 2012 WL 12519819, at *25 (W.D. Wash. June 4, 2012) (citing *Oak Tech Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316,1325 (Fed. Cir. 2001)), "or when the disclosed system performs essentially similar steps as a method claim," *id.* (citing *Versata Software, Inc. v. SAP Am., Inc.*, No. 2:07-CV-153, 2009 WL 1408520, at *13 (E.D. Tex. May 19, 2009); *Gerber Sci. Int'l, Inc. v. Roland DGA Corp.*, No. 3:06-cv-2024, 2011 WL 2133537, at *1 (D. Conn. May 27, 2011)).  The claim language here contemplates a sequential process, and because the device claim contains "essentially similar steps" as the method claim, it should be construed as requiring that the steps be performed in the same order.  *See Versata Software*, 2009 WL 1408520, at *13.

### 3.  Corrigent's Reply Brief

Defendants ask the Court, once again, to ignore the perspective of the POSA and the plain language of the claims, and instead, import non-existent, nonsensical, and inconsistent order of steps limitations into the claims.[12]

Defendants state that "it would be impossible to check the records of the FDB of said first line card before the data packet was conveyed to the first line card (1[e])." But this is incorrect. If the "first line card" is the ingress card (i.e., the card which receives the packet and performs ingress

---

[12] Defendants complain that Corrigent "provides no information on what limitations Corrigent believes explicitly provides an order." But it is *Defendants* who only address steps [1E]–[1H] and changed the scope of their construction of this term after briefing began. Corrigent does not dispute that the data packet must be received before it can be checked or conveyed (thus, [1D] happens before [1E]–[1H]). *See* Ex. 2, ¶51. But this is explicit in the claims ("conveying … said *received data packet*") and therefore, does not require construction. Corrigent also does not dispute that [1H], which is explicitly conditional on the check performed in [1G], occurs after [1G]. *Id.*, ¶56.

processing), *and* the egress card (i.e., the card which transmits the packet to the destination and performs egress processing), it is not "impossible" to check the records of the first line card *before* conveying the data packet. Ex. 4, ¶¶47–48, 59–60. In fact, this is the specific example provided by the specification regarding the MAC destination address checking ([1F]) that the Defendants fail to address. *See* '400 Patent, 3:10–16. Defendants' proposed construction would therefore exclude a preferred embodiment, which is "rarely, if ever, correct." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,* 616 F.3d 1283, 1290 (Fed. Cir. 2010) quoting *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1583–84 (Fed. Cir. 1996).

Regarding steps [1G] and [1H], the MAC source address checking and resulting functionality, the specification states that, in some embodiments, there may be a preference for "[l]earning on egress" for "flooded packets." *Id.*, 7:60–61. But the fact that the patent explains a potential preference for "flooded packets," is evidence that the POSA would understand that the MAC source address learning is not limited only to that preference, and could occur as part of either ingress or egress processing. *See* Ex. 4, ¶¶48, 60; Ex. 2, ¶54. And again, nothing about the claim language requires steps [1G] and [1H] to occur after step [1E]. Ex. 2, ¶¶53–54.

An annotated Figure 1 below illustrates that Defendants' construction is improper. As annotated, the red line card is the "first line card," which is also a member line card as the orange ports are part of the LAG 38. Ex. 4, ¶46. As shown in purple, LAN 26 is connected to the first line card at the blue port. *Id.* The green line card is the second line card, which in this exemplary embodiment is also a member line card. *Id.*



FIG. 1

*Id.* ¶45.

At [1D], a data packet is received at the blue port on the first line card, where ingress processing, which would include at least MAC destination address checking, would be performed. *Id.* ¶47; '400 Patent, 7:25–30. Thus, the first line card would check the MAC destination address against the records in the FDB of the first line card ([1F]). *Id.* If the first line card knows of a relationship between a port and the destination address, the packet will be forwarded, or conveyed, to that port for transmission to the destination ([1E]). *Id.*; Ex. 2, ¶¶51–52. If the MAC destination address is unknown, then flooding will occur. Ex. 4, ¶47 Thus, the POSA would recognize that the MAC destination address check ([1F]) can be performed *before* the conveying ([1E]). Defendants' construction is improper because it excludes this embodiment, which the POSA would understand to be consistent with the claims and specification. *Id.*, ¶¶48, 60.

In this example, the MAC source address checking ([1G]) could also occur as part of the ingress processing *on the first line card* when the first line card initially receives the packet. *Id.*

¶47; Ex. 2, ¶¶53–54. Or, in another embodiment, the source address checking could occur as part of egress processing, which may be advantageous for flooded packets. *See* '400 Patent, 3:3–20, 7:60–61; Ex. 2, ¶¶53–54.

Claim 11, unlike claim 1, is an apparatus claim that requires the line cards to be "arranged" in a way that they can carry out data packet flow steps that are similar to [1D]–[1H] in method claim 1. In this way, claim 11 recites a structure, arranged, or capable of carrying out certain steps. *Motorola Mobility, Inc. v. Microsoft Corp.*, 2012 WL 12519819, at *25 (W.D. Wash. June 4, 2012) ("the law differentiates between the method claims and apparatus claims when imposing an order of steps."). Corrigent does not dispute that some of those steps have an inherent order (e.g., a packet has to be received first). But the POSA would understand any ordering from the plain language itself, such that no construction of the order of steps is required. *Creative Internet*, 2008 WL 5061625, at *16.

Defendants construction is based on a false premise that the first line card cannot be the line card that performs both the ingress and egress processing. But that position is contrary to the plain language of the claims and the POSA's understanding. *See* Ex. 4, ¶¶43–44, 47–48.

### 4. Defendants' Sur-Reply Brief

The claims require an order of steps. As Corrigent acknowledges, claims 1 and 11, and in particular 1[d]–1[h] and 11[d], describe a packet *flow*. Corrigent's position that not only no order is required but also that sometimes the reverse order is required, wreaks havoc on an otherwise straightforward claim.

Defendants acknowledge that a line card could perform ingress and egress functionalities. '400 patent, 3:10-16. Indeed, referring to Figure 1, if a packet goes from computer 22 to computer 24, the line card that receives the packet would act as an ingress (e.g., line card 36 on the left-side

of node 30) and the line card that transmits the packet would act as an egress (e.g., line card 36 on

the right-side of node 30). If the packet went in the other direction, the roles would be reversed.

What is not disclosed is the situation raised by Corrigent of a single packet coming into a line card,

going into the switching core, and then coming back to the same line card such that the ingress and

egress line cards for a single packet flow are one and the *same*. To demonstrate such a flow,

Corrigent *altered* Figure 1.



The purple line Corrigent has drawn from LAN 26 to the blue port is not in the original figure, and

Corrigent deleted the original line from LAN 26 without noting this deletion.

In addition to changing the patent's disclosures, Corrigent contends that the MAC

forwarding step in 1[f] must be performed *before* 1[e]. *Supra* VI.C.3, p. 61. But Defendants know

of no authority, and Corrigent does not identify any, in which there was a finding that the claims

must be performed in the reverse order from that recited. Corrigent's strained reading of the claims,

compelled by its attempt to save the claims from a finding of indefiniteness, *see supra* pp. 46-47,

leads to absurd results and cannot be the correct construction.

Corrigent also alleges that MAC learning on egress (1[g], 1[h]) is just a "preference," but

it is more than that. The specification consistently only describes MAC learning on the egress path.

Figure 2 indicates that MAC learning of the source address (SA) is performed on the egress. And

Figure 3 states "*egress* receives packet and checks SA." Corrigent's unsupported assertions that MAC learning "could occur as part of either ingress or egress processing" is not disclosed anywhere in the specification. *Supra* VI.C.3, p. 60 (citing only to its expert's conclusory opinions). Therefore, 1[e] must be performed before 1[f] and 1[g].

### D. "conveying … said received data packet … to at least said first line card for transmission to said MAC destination address / said ingress line card conveys said data packet … to at least said first line card for transmission to said MAC destination address" (claims 1, 11)

| Corrigent's Construction | Defendants' Construction |
| --- | --- |
| Claim 1:<br>conveying, by transmitting said data packet to said MAC destination address via said first port, said received data packet in said network node to at least said first line card for transmission to said MAC destination address | Claim 1:<br>conveying from a line card containing the ingress port … said received data packet … to at least said first line card for transmission to said MAC destination address |
| Claim 11:<br>said ingress line card conveys said data packet via said switching core to at least said first line card for transmission to said MAC destination address | Claim 11:<br>said ingress line card containing an ingress port conveys said data packet via said switching core to at least said first line card for transmission to said MAC destination address |

### 1. Corrigent's Opening Brief

This term needs no construction as it is readily understood by a POSA. Ex. 2, ¶¶57-59. The plain language of the claims is explicit and straightforward and any attempt to introduce new language to claims 1 and 11 is unnecessary and further complicates interpretation. A POSA would instead rely on the explicit language of the claims to understand the claim language. *Id.*, ¶59. For instance, claim 11 already states in a manner understandable to a POSA that the "ingress line card conveys[.]" *Id.* To construe the term so that it additionally reads "line card containing the ingress port" adds no additional clarity and serves only to make the claims verbose. Similarly, for claim 1, the phrase "conveying the received data packet" unambiguously refers to the data packet received on an ingress port. *Id.* The proposed constructions are unnecessary, at best duplicative

and would only cause juror confusion. Moreover, the proposed constructions seem to overlook "a switching core" in claim 11 effectively removing the process of conveying the data packet "via said switching core to at least said first line card[.]" *Id.*, ¶60. Defendants' proposed constructions of these long claim phrases is therefore unnecessary and improper and confirms that no construction of these phrases is required.

### 2. Defendants' Answering Brief

The parties agree that this term requires conveying a data packet ***to*** the first line card. Defendants' construction clarifies where the data packet is conveyed ***from***: the ingress line card containing the ingress port.  Ex. A (Michalson) ¶¶ 66-70.

Claims 1 and 11 require receiving a data packet on an ingress port of a line card and conveying the received data packet to a first line card for transmission to the MAC destination address.

| Claim 1 | Claim 11 |
|---------|----------|
| receiving a data packet on an ingress port of said network node from a MAC source address, said data packet specifying a MAC destination address on said Layer 2 data network; conveying, by transmitting said data packet to said MAC destination address via said first port, said received data packet in said network node to at least said first line card for transmission to said MAC destination address; | wherein said line cards are arranged so that upon receiving a data packet on an ingress line card from a MAC source address, said data packet specifying a MAC destination address, said ingress line card conveys said data packet via said switching core to at least said first line card for transmission to said MAC destination address, where- |

Although ports can be used to both send and receive data packets, a receiving port is referred to as an ingress port (on an ingress line card) and a sending port is referred to as an egress port (on an egress line card).  '400 patent, 3:11-27, 7:31-35.

Claim 1 states that a data packet is received "on an ingress ***port***," and claim 11 states that a data packet is received "on an ingress ***line card***."  *Id.*, claims 1, 11.  The "conveying" limitation in claim 1 requires that the data packet received on an ***ingress port*** is conveyed ***to*** the first line

card.  Defendants' construction clarifies that the data packet is conveyed *from* a line card containing the ***ingress port***.  Ex. A (Michalson) ¶ 69.

Claim 11 recites receiving a data packet on an ***ingress line card***, and Defendants' construction merely clarifies that the ingress line card ***contains an ingress port*** (from which the data packet is necessarily received).[13]  *Id.*

### 3.   Corrigent's Reply Brief

Defendants construction improperly adds superfluous limitations. Defendants suggest the Court should add the phrase "containing an ingress port" into claim 11. But this new "ingress port" is never referenced in any other limitation and, thus, is extraneous and confusing. Regarding claim 1, Defendants add "from a line card containing the ingress port." But adding references to "a line card," where the claims already recites "at least first and second line cards," and "a plurality of member line cards," risks confusing the jury. It would also improperly add a new limitation, namely "where the data packet is conveyed from."

### 4.   Defendants' Sur-Reply Brief

Construction is needed to clarify that the ingress port is contained on the ingress line card and that the received data packet is *conveyed from* the ingress line card to a first line card for transmission. Corrigent offers no alternative for where the received data packet is conveyed from because it does not appear to genuinely dispute that the ingress line card receives the data packet and ultimately conveys it to first line card for transmission. *Supra* VI.D.3, p. 66. Additionally, Corrigent is incorrect that "'ingress port' is never referenced in any other limitation." *Id.* In fact,

---

[13] Defendant's construction also resolves an antecedent basis issue for the claimed "ingress port" that is introduced for the first time in claim 11's "checking" limitation as "**said** ingress port."

claim 11 specifically references "said ingress port," which would lack antecedent basis if Defendants' proposed construction were not adopted. '400 patent, 12:47.

### E. "providing for each of said member line cards a respective forwarding database (FDB)" (claim 1)

| Corrigent's Construction | Arista's Construction[14] |
|---|---|
| No construction necessary.<br><br>Alternatively, plain and ordinary meaning which is providing for each of said member line cards a respective forwarding database (FDB) | "providing for each of said member line cards a single forwarding database (FBD)" |

### 1. Corrigent's Opening Brief

Corrigent and Dell both agree that this term needs no construction. Arista insists on construing the term in manner unsupported by the intrinsic record and contrary to the perspective of a POSA by attempting to rewrite the claim term from a "respective" FDB to a "single" FDB.

The term "respective" in the claim language is understood by a POSA to mean that each member line card is equipped with its own FDB. Ex. 2, ¶¶62-64. The POSA would interpret this to understand that while each line card might include at least one FDB, the claim is not limited to an instance where each line card is limited to only a single FDB. *Id.*, ¶63. Therefore, the term "respective" suggests a degree of flexibility and does not necessarily imply a "single" FDB for each line card as proposed by Arista. *Id.*

Additionally, the proposed construction to replace "respective" with "single" is inconsistent with the usage of "respective" elsewhere in the claims and the specification. *Id.*, ¶64. For example, in claim 1, "at least first and second line cards with respective first and second ports," in claim 2, "the respective ports," and in claim 11, "each line card having respective ports and having a respective forwarding database (FDB) to hold records associating MAC addresses with

---

[14] Dell takes no position on this term.

said respective ports," the term "respective" clearly denotes individual possession and distinction among components. *Id.* ¶64. In each of these instances, substituting "respective" with "single" would not align with the understanding of a POSA and would improperly change the intended meaning of the claims. *Id.*

### 2. Defendants' Answering Brief

Corrigent and Arista dispute whether "a respective forwarding database (FDB)" is limited to a single FDB, as Arista proposes, or means more than one FDB. *See supra* VI.E.1, pp. 67-68; Ex. A (Michalson) ¶¶ 71-73.

Line cards of the '400 patent's claimed invention each have a forwarding database (FDB) shared among its ports. '400 patent, 3:7-11. When a line card sends a data packet, it may update its FDB, and synchronization messages are sent between line cards to ensure consistency across FDBs within a node. *Id.*, 3:18-24, 8:17-22. The specification does not describe a line card having multiple FDBs nor explain how its multiple FDBs would properly be updated in that scenario. There is no intrinsic support for Corrigent's interpretation, and such complexity goes beyond any description in the '400 patent. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (Claims to be interpreted to cover only "what the inventors actually invented."); Ex. A (Michalson) ¶ 72.

According to the '400 patent, a line card bases the routing path for a data packet on its own FDB's routing information. '400 patent, 3:7-17, 7:25-41. But a line card with multiple FDBs would have multiple routing instructions with possible contradictions. Ex. A (Michalson) ¶ 72. Corrigent's proposal introduces unanswered questions, such as how a line card would update multiple FDBs and how a line card would choose among multiple routing instructions. The specification does not answer either question. There is disclosure of synchronization messages

between line cards (*e.g.*, '400 Patent, 3:26-53, 8:17-39, 8:54-9:3), but no description of multiple FDB synchronization on a <u>single</u> line card.  Ex. A (Michalson) ¶ 72.  That these issues are not contemplated confirms that the inventors did not intend such a broad scope.  *Renishaw*, 158 F.3d at 1250.  The lack of written-description support and enablement make Corrigent's interpretation more illogical.  *Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed. Cir. 1990) ("[C]laims are generally construed so as to sustain their validity.").

Corrigent's remaining arguments are irrelevant.  *Supra* VI.E.1, pp. 67-68; Ex. A (Michalson) ¶ 73.  The term "respective ports" does not share any of the above issues, nor is Arista proposing to construe any term beyond this particular instance.

### 3.  Corrigent's Reply Brief

Arista attempts to limit the scope of each member line card FDB to "a single forwarding database (FDB)." It is notable that Dell does not join in Arista's request. Arista's construction goes against the well-established maxim that "the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.' [and t]he exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (quotations omitted).

### 4.  Defendants' Sur-Reply Brief

Corrigent does not dispute that the '400 patent lacks any description of a line card with more than one FDB or any explanation of how the claimed invention could possibly work in such a system. This is because, as explained in Arista's Answering Brief, such complexity goes well beyond what the inventors actually invented or contemplated to be within the scope of the '400 Patent. *Supra* VI.E.2, pp. 68-69. Corrigent's only remaining argument is that Dell has not joined

in Arista's proposed construction, but whether or not other parties join a proposed construction has never been adopted as a principle of claim construction by the Federal Circuit.

ASHBY & GEDDES

/s/ Andrew C. Mayo

_____

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Of Counsel:*
James R. Nuttall
Katherine H. Tellez
Robert F. Kappers
Daniel F. Gelwicks
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
(312) 577-1300

Michael C. Miller
STEPTOE LLP
1114 Avenue of the Americas
New York, NY  10036
(212) 506-3955

Christopher A. Suarez
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-8003

*Attorneys for Plaintiff Corrigent Corporation*

Dated:  March 4, 2024

MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP

/s/ Jeremy A. Tigan

_____

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

Brian A. Rosenthal
Katherine Dominguez
Jaclyn Hellreich
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Stuart M. Rosenberg
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
(650) 849-5300

Ronald A. Lee
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
(949) 451-3800

Audrey Yang
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 698-3100

*Attorneys for Defendants*
*Dell Technologies Inc. and Dell Inc.*

MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

Kurt Pankratz
BAKER BOTTS LLP
2001 Ross Ave, Ste 900
Dallas, TX 75201
(214) 953-6500

Jeremy Taylor
Katherine Burgess
BAKER BOTTS LLP
101 California Street, Ste 3200
San Francisco, CA 94111
(415) 291-6200

Amara Osisioma
BAKER BOTTS LLP
98 San Jacinto Blvd, Ste 1500
Austin, TX 78701
 (512) 322-2500

*Attorneys for Defendant Arista Networks,
Inc.*