## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CORRIGENT CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 22-496-RGA |
| DELL TECHNOLOGIES INC. and DELL INC., | |
| Defendants. | |
| CORRIGENT CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No. 22-497-RGA |
| ARISTA NETWORKS, INC., | |
| Defendant. | |

## MEMORANDUM OPINION

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; James R. Nuttall (argued), Robert F. Kappers, Daniel F. Gelwicks, STEPTOE LLP, Chicago, IL; Michael C. Miller, STEPTOE LLP, New York, NY; Christopher A. Suarez (argued), STEPTOE LLP, Washington, DC, Attorneys for Plaintiff.

Jack B. Blumenfeld, Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Brian A. Rosenthal (argued), Katherine Dominguez, Jaclyn Hellreich, GIBSON, DUNN & CRUTCHER LLP, New York, NY; Stuart M. Rosenberg, GIBSON, DUNN & CRUTCHER LLP, Palo Alto, CA; Ronald A. Lee, GIBSON, DUNN & CRUTCHER LLP, Irvine, CA; Audrey Yang (argued), GIBSON, DUNN & CRUTCHER LLP, Dallas, TX, Attorneys for Defendants Dell Technologies Inc. and Dell Inc.

Jack B. Blumenfeld, Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Kurt Pankratz, BAKER BOTTS LLP, Dallas, TX; Jeremy Taylor (argued), Katherine Burgess, BAKER BOTTS LLP, San Francisco, CA; Amara Osisioma, BAKER BOTTS LLP, Austin, TX, Attorneys for Defendant Arista Networks, Inc.

May _29_, 2024

1

ANDREWS, UNITED STATES DISTRICT JUDGE:

Before me is the issue of claim construction of multiple terms in U.S. Patent Nos. 6,957,369 ("the '369 patent") and 7,593,400 ("the '400 patent"). The parties submitted a Joint Claim Construction Brief and Appendix. (D.I. 79, 80, 81).[1] I heard oral argument on April 4, 2024. (D.I. 95).

## I.   BACKGROUND

On April 19, 2022, Plaintiff filed a complaint against Defendants Dell and Dell Technologies and another complaint against Defendant Arista Networks. Both complaints allege infringement of the '369 and '400 patents.[2] (D.I. 1 ¶ 1 (No. 22-496), D.I. 1 ¶ 1 (No. 22-497)). The '369 patent "relates generally to diagnostic testing of electronic equipment, and specifically to non-intrusive self-testing of communication systems." ('369 patent at 1:5–7). The '400 patent "relates generally to communication networks, and specifically to methods and systems for bridging in virtual private LAN services (VPLS) and other distributed bridging systems." ('400 patent at 1:6–9). Although one of the '369 patent's inventors is named as an inventor of the '400 patent, the two patents are not related. The application for the '369 patent was filed on May 30, 2002, and the application for the '400 patent was filed on May 19, 2006.

---

[1] Unless stated otherwise, citations refer to the docket in *Corrigent Corp. v. Dell Techs. Inc.*, No. 22-496.

[2] There is a case filed in the Western District of Texas, captioned *Corrigent Corp. v. Cisco Sys., Inc.*, No. 6:22-cv-396. The same two patents (and others) are asserted in that case. The District Court issued an order construing some of the same terms in that case. To date, the District Court has not given any rationale for the constructions. I have considered those constructions, but I have disagreements with some of them.

## II.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (cleaned up). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (cleaned up). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.' . . . [It is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13 (citations omitted). "[T]he 'ordinary meaning' of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily

3

apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely on the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based on consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Inferring indefiniteness because a claim's scope is broad, however, is "legally incorrect: 'breadth is not indefiniteness.'" *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005)). The party raising indefiniteness bears the burden of proving it by clear and convincing evidence. *See BASF*, 875 F.3d at 1365.

## III.   CONSTRUCTION OF AGREED-UPON TERMS

I adopt the following agreed-upon construction:

| Claim Term | Construction |
|---|---|
| forwarding database (FDB) | no construction necessary |

## IV.   CONSTRUCTION OF DISPUTED TERMS

The parties submit claims 1 and 15 of the '369 patent and claims 1, 8, 11, and 18 of the

'400 patent as exemplary claims for the purpose of claim construction.  Those claims state:

1.  In an electronic system that includes a ***main module*** and at least first and second ***subsidiary modules***, each of said at least first and second ***subsidiary modules*** connected to the ***main module*** by one or more lines for carrying data, at least some of which lines are sometimes idle, the ***main module*** including a switch having ports connected to the lines, a method for self-testing the system, comprising:

selecting a first ***idle line*** among ***idle lines*** connecting the first ***subsidiary module*** to a first port of the switch on the ***main module*** to serve as an aid line;

instructing the first ***subsidiary module*** to loop back traffic reaching the first ***subsidiary module*** via the aid line;

selecting for testing a second ***idle line*** among the ***idle lines*** connecting the second ***subsidiary module*** to a second port of the switch on the ***main module***;

configuring the switch to link the first and second ports;

transmitting test traffic over the second ***idle line*** from the second ***subsidiary module*** to the ***main module***, wherein the test traffic is conveyed via the switch to the aid line connecting to the first ***subsidiary module***; and

reporting that a failure has occurred if the test traffic does not return to the second ***subsidiary module*** within a predetermined period of time.

('369 patent at 7:2–25 (disputed terms bolded and italicized)).

15.  Modular electronic apparatus, comprising:

a ***backplane***, which comprises traces for carrying data between modules that are plugged into the ***backplane***;

a ***main module***, plugged into the ***backplane***, the ***main module*** comprising a switch having ports for connection to the traces of the ***backplane***;

at least first and second ***subsidiary modules***, plugged into the ***backplane*** so as to be connected to the ***main module*** by the traces, at least some of which traces are sometimes idle; and

***a system control processor***, which is operative to select a first ***idle trace*** among ***idle traces*** connecting the first ***subsidiary module*** to a first port of the switch on the ***main module*** to serve as an aid trace, to instruct the first ***subsidiary module*** to loop back traffic reaching the first ***subsidiary module*** via the aid trace, to select for testing a second ***idle trace*** among the ***idle traces*** connecting the second ***subsidiary module*** to a second port of the switch on the ***main module***, and to configure the switch to link the first and second ports, the ***system control processor*** being further operative to cause test traffic to be transmitted over the second ***idle trace*** from the second ***subsidiary module*** to the ***main module***, wherein the test traffic is conveyed via the switch to the aid trace connecting to the first ***subsidiary module***, and to report that a failure has occurred if the test

> traffic does not return to the second **subsidiary module** within a predetermined period of time.

(*Id.* at 8:44–9:5 (disputed terms bolded and italicized)).

> 1. A method for communication, comprising:
> configuring a network node having a plurality of ports, and at least first and second line cards with respective first and second ports, to operate as a distributed media access control (MAC) bridge in a Layer 2 data network;
> configuring a link aggregation (LAG) group of parallel physical links between two endpoints in said Layer 2 data network joined together into a single logical link, said LAG group having a plurality of LAG ports and a plurality of conjoined member line cards;
> providing for each of said member line cards a respective forwarding database (FDB) to hold records associating MAC addresses with ports of said plurality of ports of said network node;
> receiving a data packet on an ingress port of said network node from a MAC source address, said data packet specifying a MAC destination address on said Layer 2 data network;
> **conveying**, by transmitting said data packet to said MAC destination address via said first port, **said received data packet** in said network node **to at least said first line card for transmission to said MAC destination address**;
> if said MAC destination address does not appear in **said FDB**, flooding said data packet via said one and only one LAG port of said plurality of LAG ports;
> checking said MAC source address of the data packet against records in said FDB of said first line card; and
> if said FDB of said first line card does not contain a record of an association of said MAC source address with said ingress port, creating a new record of said association, adding said new record to the FDB of said first line card, and sending a message of the association to each member line card of said plurality of member line cards.

('400 patent at 10:65–11:30 (disputed terms bolded and italicized)).

> 8. The method according to claim 1, wherein the network node is configured to operate as multiple **virtual MAC bridges** in a Layer 2 virtual private network (VPN), wherein each **virtual MAC bridge** is configured to serve a respective VPN instance, and wherein the records associating the MAC addresses with the respective ports are maintained independently for each of the VPN instances.

(*Id.* at 11:66–12:5 (disputed terms bolded and italicized)).

> 11. A node for network communication, comprising:
> a switching core;
> a plurality of ports;

6

a plurality of member line cards conjoined in a link aggregation (LAG) group of parallel physical links between two endpoints in a Layer 2 data network joined together into a single logical link, having a plurality of LAG ports to forward packets through said switching core so that the node operates as a ***virtual media access control (MAC) bridge*** in said Layer 2 data network, said plurality of member line cards including at least first and second line cards, each line card having respective ports and having a respective forwarding database (FDB) to hold records associating MAC addresses with said respective ports of said line cards,

wherein said line cards are arranged so that upon receiving a data packet on an ingress line card from a MAC source address, said data packet specifying a MAC destination address, ***said ingress line card conveys said data packet*** via said switching core ***to at least said first line card for transmission to said MAC destination address***, whereupon said first line card checks said MAC source address of said data packet against records in said FDB of said first line card, and if said FDB database of said first line card does not contain a record of an association of said MAC source address with said ingress port, adds said record to the FDB of said first line card and sends a message to at least said second line card informing said second line card of said association, and arranged, when said MAC destination address does not appear in ***said FDB***, to flood said data packet via one and only one of said LAG ports.

(*Id.* at 12:22–53 (disputed terms bolded and italicized)).

18. The node according to claim 11, wherein at least some of the line cards are configured so that the node operates as multiple ***virtual MAC bridges*** in a Layer 2 virtual private network (VPN), wherein each ***virtual MAC bridge*** is configured to serve a respective VPN instance, and wherein the records associating the MAC addresses with the respective ports are maintained independently for each of the VPN instances.

(*Id.* at 13:21–14:6 (disputed terms bolded and italicized)).

## A. '369 patent

## 1. "main module" ('369 patent, claims 1, 2, 4, 5, 8–11, 15, 16, 18, 21–23)

a. *Plaintiff's proposed construction*: no construction necessary; alternatively, plain and ordinary meaning which is a module that has a connection to one or more subsidiary modules via one or more data lines or traces

b. *Defendants' proposed construction*: a hardware module that combines data from subsidiary modules

c. *Court's construction*: a primary hardware module that has a connection to one or more subsidiary modules via one or more data lines or traces

Plaintiff argues this term does not need construction, but to the extent that it does, it should be construed as "a module that has a connection to one or more subsidiary modules via one or more data lines or traces." (D.I. 79 at 10). Plaintiff contends the term "is not limited to hardware modules with a switch for multiplexing." (*Id.*). Plaintiff thus argues that Defendants are attempting to read additional limitations into the term's plain and ordinary meaning. (*Id.*).

Defendants argue that Plaintiff "seeks to effectively excise the word 'main' from the claims." (*Id.* at 11). Defendants contend, "What makes the main module a 'main' module is its relationship to the subsidiary module." (*Id.*). Defendants argue that the main module is hardware.[3] (*Id.* at 14). Defendants further argue that the specification discloses only one embodiment, in which the main module "combines (i.e., aggregates or multiplexes) the data from and controls the subsidiary modules." (*Id.* at 11–12).

Plaintiff responds that the claims and specification do not describe a main module that combines data from subsidiary modules. (*Id.* at 13). Plaintiff contends that Defendants are improperly attempting to construe the claim term based on a preferred embodiment. (*Id.*). Plaintiff further argues that a main module may "be implemented only in software." (D.I. 95 at 33:1–3).[4]

I agree with Defendants that the term "main module" must include hardware. Plaintiff mainly relies on Dr. Olivier's opinion to argue that a main module may be implemented in software. (*See* D.I. 79 at 14 (citing D.I. 81-2 ¶ 14)). Dr. Olivier's opinion, however, is

---

[3] In the briefing, Defendants had also argued for a "switch," but they later dropped that. (*See* D.I. 95 at 22–23).

[4] At oral argument, Plaintiff did not dispute that the main module recited in claim 15 must be hardware. (D.I. 95 at 11:19–22). Plaintiff relies on claim differentiation principles to argue that claim 1, unlike claim 15, does not necessarily require hardware. (*Id.* at 12:16–24). Defendants argue that both claims refer to the same main module. (*Id.* at 24:1–14).

unsupported by intrinsic evidence. Plaintiff's citations to the '369 patent describe virtual (i.e., implemented in software) connections between subsidiary modules. (*See* '369 patent at 5:5–9, 6:10–17). Plaintiff does not point to any intrinsic evidence showing that the main module itself may be software only or that any connections with the main module may be software only. The expert opinion, on its own, is insufficient to broaden the scope of "main module" to include a software-only module. *See Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

On the other hand, I agree with Plaintiff that the term "main module" does not require combining data from subsidiary modules. Defendants' references to the specification show only that one embodiment of the invention combines data from subsidiary modules. (*See, e.g.*, '369 patent at 1:30–32 ("The main module typically includes a switch for multiplexing among the subsidiary modules."), 5:1–3 ("In this embodiment, switch 28 aggregates upstream traffic from ports 30 to an uplink trunk connecting to a high-speed network.")). Defendants cannot import limitations from a preferred embodiment into the claims, even if the specification only describes one preferred embodiment. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."); *Phillips*, 415 F.3d at 1323 ("In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Lastly, I agree with Defendants that the relationship between main modules and subsidiary modules is important.[5]  The ordinary meaning of "main" suggests that a main module is more important than any subsidiary modules.  In other words, the main module is the primary module.  I thus construe the term "main module" as "a primary hardware module that has a connection to one or more subsidiary modules via one or more data lines or traces."

### 2. "subsidiary module" ('369 patent, claims 1–3, 5, 8–12, 15–17, 21–24)

a. *Plaintiff's proposed construction*: no construction necessary; alternatively, plain and ordinary meaning which is a module that has a connection to a main module via one or more data lines or traces
b. *Defendants' proposed construction*: a hardware module under the control of the main module
c. *Court's construction*: a secondary hardware module that has a connection to a main module via one or more data lines or traces

Plaintiff argues that the term "subsidiary module" does not need to be construed.  (D.I. 79 at 15).  At most, Plaintiff contends that a construction should "merely [] confirm that there is some relationship" between the main and subsidiary modules.  (*Id.*).  Plaintiff argues the claims and specification show "that a connection between the subsidiary module and the main module is all that is required."  (*Id.*).  Plaintiff contends that the claims, specification, and prosecution history do not support construing a subsidiary module as being "under the control of the main module."  (*Id.*).

Defendants argue that the plain language requires a "subsidiary module" to be (1) a module that is (2) subsidiary to something.  (*Id.* at 16).  Defendants contend that the claim

_____

[5] According to Plaintiff's proposed constructions, if two modules were connected to each other by a data line or trace, each, by definition, would be both a main module and a subsidiary module.  For that reason, I think Plaintiff's proposed constructions for main and subsidiary modules are clearly wrong.

language also requires the main module to control the subsidiary module. (*Id.*).[6] Defendants argue that "the specification expressly describes the main module as controlling the subsidiary module via 'a separate control channel.'" (*Id.* at 17 (quoting '369 patent at 5:41–45)). Defendants contend that Plaintiff's proposed construction rewrites the claim term to cover connected modules that do not have a main/subsidiary relationship. (*Id.*).[7]

I disagree with Defendants that a subsidiary module must be under the control of the main module. As explained below, I do not think the asserted claims require the system control processor to be in the main module. Defendants' contention that the subsidiary module is under the control of the main module as a result of the subsidiary module being instructed by the system control processor is thus unpersuasive. Defendants' other references to the specification only show that the main module instructs the subsidiary module in some embodiments. (*See, e.g.*, '369 patent at 2:5–9).

For the same reasons that I construed "main module" to require hardware, I think the term "subsidiary module" requires hardware, too. I also conclude that the ordinary meaning of "subsidiary" suggests that subsidiary modules are less important than main modules. In other words, subsidiary modules are secondary. I thus construe "subsidiary module" as "a secondary hardware module that has a connection to a main module via one or more data lines or traces."

---

[6] The parties dispute the relevance of "system control processor" to the scope of the disputed term. Plaintiff argues that the system control processor is only recited in dependent claim 16, not claim 1, and that the claim language merely shows that a system control processor might control a subsidiary module. (D.I. 79 at 18).

[7] Plaintiff notes that the Western District of Texas rejected Defendants' proposed construction in another case. (D.I. 79 at 17). Defendants argue the construction in the Texas case is irrelevant, as that court adopted the claim term's plain and ordinary meaning, whereas the parties here dispute what the plain and ordinary meaning is. (*Id.* at 19).

3. **"backplane" ('369 patent, claims 5, 10, 15, 21)**

   a. *Plaintiff's proposed construction*: plain and ordinary meaning, which is hardware used to establish interconnections between modules
   b. *Defendants' proposed construction*: a printed circuit board, in the back of communications equipment, providing communications pathways between modules
   c. *Court's construction*: a support surface in a computer with the electrical connections necessary to join the internal components of the computer

Plaintiff contends that Defendants' proposed construction is improperly narrow because it describes only one example of a backplane. (D.I. 79 at 19–20). Plaintiff argues that the specification shows that a backplane establishes interconnections. (*Id.* at 20 (citing '369 patent at 1:25–30, 1:47–49, 4:58–61)). Plaintiff further relies on the specification and surrounding claim language to argue that a backplane may "be implemented using hardware other than a printed circuit board." (*Id.*). Plaintiff notes that the Western District of Texas adopted Plaintiff's proposed construction of "hardware used to establish interconnections between modules" and declined to construe the term as "a printed circuit board into which modules may be inserted." (*Id.*).

Defendants argue Plaintiff is attempting "to read its claims on network nodes communicating with each other over the Internet." (*Id.* at 21). Defendants contend that the specification of the '369 patent only uses "backplane" to mean "a 'printed circuit' into which modules are plugged and connected via 'printed circuit traces.'" (*Id.* (citing '369 patent at 1:64–67)). Defendants contend that the Ke reference, which the '369 patent incorporates, supports this construction. (*Id.*). Defendants further contend that technical dictionaries show backplanes are printed circuit boards. (*Id.* at 22).

Plaintiff responds that the Ke reference does not limit the meaning of "backplane" because the reference only provides an example of a backplane. (*Id.* at 23). Plaintiff relies on extrinsic evidence to argue that backplanes may include connections using wires or cables, i.e.,

12

something other than a printed circuit board. (*Id.*).  Lastly, Plaintiff contends that the

specification does not support requiring a backplane to be in a particular location. (*Id.* at 23–24).

Defendants, on the other hand, contend that Plaintiff's proposed construction "collapses any

distinction between backplanes and traces/lines." (*Id.* at 24).

The dictionary definition of "backplane" is "a support surface in a computer with the

electrical connections necessary to join the internal components of the computer."[8]  I think this

definition reflects the plain and ordinary meaning of the disputed term.  I therefore adopt it.  I

reject Defendants' proposed construction, as I agree with Plaintiff that Defendants are attempting

to read in additional limitations. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362,

1366 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not

redefine words."); *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("When

consulting the specification to clarify the meaning of claim terms, courts must take care not to

import limitations into the claims from the specification.").

### 4. "idle line" / "idle trace" ('369 patent, claims 1, 4, 7, 15, 18, 20)

a. *Plaintiff's proposed construction*: no construction necessary; alternatively, plain
   and ordinary meaning which is a line/trace that has spare capacity for testing[9]
b. *Defendants' proposed construction*: a [trace/line] that is determined to be inactive
c. *Court's construction*: a [line/trace] that is inactive

---

[8] *See backplane*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/backplane.  This definition is consistent with definitions from some
technical dictionaries of the relevant time, as the technical dictionaries recognize printed circuit
boards as the most common type of backplane but acknowledge the possibility that a backplane
may be something else. (*See* D.I. 81-10 at 4–5 of 5 ("The physical mechanism by which signals
are routed between agents.")).

[9] At oral argument, Plaintiff stated that the claim construction briefing (*see* D.I. 79 at 24–25)
inadvertently included a different proposed construction for this term.  Plaintiff contends that "a
line/trace that has spare capacity for testing" is more appropriate.  (D.I. 95 at 57:6–58:2).

Plaintiff relies on the specification to argue that the plain and ordinary meaning of this term is "a line that has spare capacity for testing." (D.I. 79 at 25). Plaintiff contends that the claims do not require determining whether a line is inactive. (*Id.*).

Defendants contend that under Plaintiff's proposed construction, both active and inactive lines would fall within the scope of the claims as long as they were not "flooded." (*Id.*). Defendants thus argue that "any line at less than 100% capacity (e.g., 99%) would be considered idle." (*Id.* at 29). Defendants argue that such a view is inconsistent with the patent's purpose, which "is to test idle lines and to find 'hidden failures' that will not be discovered until the line is utilized." (*Id.* at 25). Defendants further contend that Plaintiff's proposed construction would render the term "idle" superfluous, as failures are not hidden on active lines. (*Id.* at 25–26). Defendants argue that the specification distinguishes between idle lines and active lines because the two are opposites. (*Id.* at 26). Defendants contend that their proposed construction captures a fundamental aspect of the patent—knowing whether lines are active. (*Id.*).

Plaintiff responds that the Western District of Texas "rejected a construction that an 'idle line' is 'known' to be idle." (*Id.* at 27). Plaintiff argues that the claims do not refer to "hidden failures," and a "POSA would understand that any failure that is as of yet unknown in a networking system is a hidden one, including failures detected on lines with spare capacity." (*Id.*). Plaintiff also contends that the claims do not distinguish between active and idle lines, whereas the specification merely discloses a preferred embodiment that contrasts idle and active lies. (*Id.* at 28).

I agree with Defendants that any line below 100% capacity would be considered idle under Plaintiff's proposed construction. Such a construction would be inconsistent with the disclosures in the '369 patent. The specification distinguishes between idle lines and active

14

lines. (*See, e.g.*, '369 patent at 5:30–31 ("In FIG. 1, active traces 36 are shown by solid lines,

and idle traces 38 are dashed.")). This distinction is not limited to descriptions of preferred

embodiments. (*See id.* at 1:15–18 ("From the operator's point of view, hidden failures are a

particularly troublesome problem, since they may remain undetected until the idle component is

activated.")). I therefore construe "idle line" and "idle trace" as "a [line/trace] that is inactive."[10]

5. **"a system control processor" ('369 patent, claims 15, 16, 18, 21, 23, 24)**

    a. *Plaintiff's proposed construction*: no construction necessary; alternatively, plain and ordinary meaning which is system control processor
    b. *Defendants' proposed construction*: a processor residing in the main module
    c. *Court's construction*: no construction necessary

Plaintiff argues the '369 patent does not indicate that a system control processor must be

in the main module. (D.I. 79 at 30). Plaintiff contends that Defendants are attempting to

improperly limit the claim scope to preferred embodiments. (*Id.*). Defendants, on the other

hand, argue that there is only one embodiment and it "requires a system control processor that is

part of the main module." (*Id.* at 30). The parties also disagree as to whether the language in

claims 15 and 21 shows that the main module and system control processor may be separate.

(*Id.* at 31–32).

I agree with Plaintiff that this term does not require construction. Defendants have not

shown that a system control processor necessarily resides in the main module. Defendants

mainly rely on a preferred embodiment to support their position. (*See* '369 patent at 5:41–45).

The claim language, however, is not limited to this embodiment. Claim 15, for example, states

that a "[m]odular electronic apparatus" includes both "a main module" and "a system control

processor." Each one is described in a different limitation. (*See id.* at 8:44–9:5). The claim

---

[10] Regarding the "determined" proposal by Defendants, I do not think the evidence shows that a knowledge requirement has been claimed.

language thus does not require the system control processor to be in the main module. I

conclude that Defendants are attempting to import a limitation from a preferred embodiment into

the claims. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very

specific embodiments of the invention, we have repeatedly warned against confining the claims

to those embodiments.").

### 6. order of steps ('369 patent, claims 1, 8, 15, 21)

   a. *Plaintiff's proposed construction*: not all limitations require an ordering; those
      that do are explicit in the claim language used; claims 15 and 21 are not method
      claims
   b. *Defendants' proposed construction*: the instruct[ing] step must be performed after
      completion of the first selection; the configur[ing/e] step must be performed after
      completion of both selections; and the transmit[ting] step must be performed after
      both selections
   c. *Court's construction*: the instruct[ing] step must be performed after completion of
      the first selection; the configur[ing/e] step must be performed after completion of
      both selections; and the transmit[ting] step must be performed after both
      selections

The parties dispute whether the steps of the asserted claims must occur in order. Each

independent claim of the '369 patent recites six steps. (D.I. 79 at 35). The six steps of claim 1

state:

> [1A] selecting a first idle line among idle lines connecting the first subsidiary
> module to a first port of the switch on the main module to serve as an aid line;
> [1B] instructing the first subsidiary module to loop back traffic reaching the first
> subsidiary module via the aid line;
> [1C] selecting for testing a second idle line among the idle lines connecting the
> second subsidiary module to a second port of the switch on the main module;
> [1D] configuring the switch to link the first and second ports;
> [1E] transmitting test traffic over the second idle line from the second subsidiary
> module to the main module, wherein the test traffic is conveyed via the switch to
> the aid line connecting to the first subsidiary module; and
> [1F] reporting that a failure has occurred if the test traffic does not return to the
> second subsidiary module within a predetermined period of time.

(*Id.* (quoting '369 patent at 7:9–25)).

Plaintiff argues that the asserted claims do not recite an order of steps. (D.I. 79 at 32–33). Plaintiff contends the steps "can be performed continuously and in a near-simultaneous or concurrent fashion." (*Id.* at 33). Plaintiff also argues that "steps [1A] through [1D] can occur in numerous different orders in ways that would allow the purpose of the invention (testing for failures in step [1F]) to be achieved." (*Id.*). Plaintiff argues that importing an order of steps into the apparatus claims (claims 15 and 21) is inappropriate. (*Id.* at 34–35).[11] At oral argument, Plaintiff conceded that step [1E] must occur after steps [1A] through [1D], and that step [1F] must occur after step [1E]. (D.I. 95 at 83:13–84:21).

Defendants say they do not seek an order for all steps. (D.I. 79 at 36). They argue, however, that the claims require that: (1) step [1B], the instructing, occurs after step [1A], the first selection; (2) step [1D], the configuring, occurs after the steps [1A] and [1C], the first and second selections; and (3) step [1E], the transmitting, occurs after steps [1A] and [1C], the first and second selections. (*Id.*). Defendants contend that their construction "imposes an order merely on those limitations that explicitly refer back to the results of a previous step." (*Id.*). Defendants contend that the intrinsic record does not indicate the steps can occur simultaneously. (*Id.* at 38). Defendants further argue that an order of steps is appropriate for the apparatus claims because the method and apparatus claims "contain virtually identical limitations . . . including the same referential language back to the prior steps." (*Id.* at 37).

I agree with Defendants that step [1B] must occur after step [1A], that step [1D] must occur after steps [1A] and [1C], and that step [1E] must occur after steps [1A] and [1C]. Steps [1B] through [1E] refer to outputs from previous steps. Step [1A] recites "selecting a first idle

---

[11] Plaintiff acknowledges that the Western District of Texas concluded the claims require an order of steps. (*See* D.I. 79 at 34 n.6).

17

line . . . to serve as an aid line." ('369 patent at 7:9–11). Step [1B] then refers back to "the aid line" mentioned in step [1A]. (*Id.* at 7:12–13). The claim language thus suggests that step [1B] occurs after step [1A]. Step [1A] also recites "a first port of the switch," while step [1C] recites "a second port of the switch." (*See id.* at 7:9–11, 7:14–16). Step [1D] then refers back to "the first and second ports" that were introduced in steps [1A] and [1C]. (*Id.* at 7:17). The claim language thus suggests that step [1D] must occur after steps [1A] and [1C]. Step [1E] follows a similar logic. It refers to "the aid line connecting to the first subsidiary module," which was introduced in step [1A]. (*See id.* at 7:9–11, 7:18–21). Step [1E] also recites "the second idle line," which refers back to "a second idle line" in step [1C]. (*See id.* at 7:14–16, 7:18–21). The claim language thus suggests that step [1E] must occur after steps [1A] and [1C].

Plaintiff does not provide a persuasive reason why the steps "can be performed continuously and in a near-simultaneous or concurrent fashion."[12] Plaintiff mainly relies on Dr. Olivier's opinion (*see* D.I. 79 at 33–34 (citing D.I. 80-2 ¶¶ 32–34)), but that opinion is not consistent with the claim language. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("[E]xtrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language."); *Phillips*, 415 F.3d at 1318 ("[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with

---

[12] I note that performing the steps in a "near-simultaneous" way is not inconsistent with performing the steps in order.

the written record of the patent.'" (citation omitted)).  I therefore reject Plaintiff's proposed

construction.[13]

### B. '400 patent

### 1. "said FDB" (claims 1, 11)

   a. *Plaintiff's proposed construction*: not indefinite; alternatively, plain and ordinary
      meaning which is said FDB of said first line card
   b. *Defendants' proposed construction*: indefinite
   c. *Court's construction*: said FDB of said first line card

Plaintiff argues that a POSA, reading the claims in light of the specification, would have

understood that "said FDB" refers to the FDB of the first line card.  (D.I. 79 at 39).  Plaintiff

notes that "said FDB" is recited three times in each of claims 1 and 11.  (*Id.* at 39–40).  Two of

those instances state, "said FDB of said first line card."  (*Id.* at 40).  Plaintiff thus argues that a

POSA would have been reasonably certain that the third use of "said FDB" also refers to the first

line card.  (*Id.*).  Plaintiff notes that the Western District of Texas found this term is not

indefinite and construed it as its "plain and ordinary meaning, wherein 'said FDB' means 'said

FDB of said first line card.'"  (*Id.* (quoting D.I. 80-1 at 35 of 111)).

Defendants argue the "claims are indefinite because they recite multiple 'FDBs' and later

ambiguously refer to 'said FDB,' without clarifying to which one of the previously recited FDBs

---

[13] I reach the same conclusion for the apparatus claims (claims 15 and 21).  Plaintiff does not
point to any Federal Circuit authority holding that courts should not impose an order of steps on
apparatus claims.  As Defendants point out, multiple district courts have imposed such orders
since the 2008 decision in *Creative Internet Advertising Corp. v. Yahoo! Inc.*, 2008 WL 5061625
(E.D. Tex. Nov. 24, 2008).  (*See* D.I. 79 at 38–39).  I also agree with Defendants that *Baldwin
Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008), is distinguishable from the
present case.  Unlike claims 15 and 21 of the '400 patent, the apparatus claims in *Baldwin* were
"pure apparatus claims" and had "no process limitations."  *Id.* at 1344.  Because "the disclosed
system performs essentially similar steps as [the] method claim," *Maxim Integrated Prods., Inc.
v. Silicon Mitus Tech., Inc.*, 2018 WL 4657384, at *9 (N.D. Cal. July 3, 2018) (citation omitted),
I conclude that imposing an order of steps on claims 15 and 21 is proper.

it refers." (*Id.*). Defendants compare the present case to *Bushnell Hawthorne, LLC v. Cisco Systems, Inc.*, 813 F. App'x 522 (Fed. Cir. 2020), and to *Collabo Innovations, Inc. v. OmniVision Technologies, Inc.*, 2017 WL 3670661 (D. Del. Aug. 25, 2017), both of which found certain terms to be indefinite. (*Id.* at 42). Defendants further argue that Plaintiff's proposed construction would "rewrit[e] the claims so that they no longer make any sense." (*Id.* at 46).

I think the present case is distinguishable from both *Bushnell* and *Collabo*. Whereas the intrinsic records in *Bushnell* and *Collabo* did not provide any guidance as to the antecedent bases for "said different IP address" and "the first active region," the surrounding claim language in the '400 patent clarifies which line card relates to "said FDB." Claim 11 first describes "a plurality of member line cards . . . , said plurality of member line cards including at least first and second line cards, each line card having respective ports and having a respective forwarding database (FDB) . . . ." ('400 patent at 12:25–36). In the following limitation, the claim recites "said FDB of said first line card," "said FDB database of said first line card,"[14] and "the FDB of said first line card," followed by "said FDB." (*Id.* at 12:37–53). Because the claim consistently refers only to the first line card in relation to the FDB, a POSA would have understood that "said FDB" also refers to the first line card. *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006) (stating that "despite the absence of explicit antecedent basis, 'If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite'" (citation omitted)).

Claim 1 has slightly different wording—reciting "said FDB" before reciting "[said/the] FDB of said first line card" three times ('400 patent at 11:20–30)—than claim 11. Defendants'

---

[14] "Said FDB database . . ." reflects an editing error, since "said [forwarding database] database . . ." is obviously an error.

argument with regard to claim 1 is marginally stronger than it is with regard to claim 11. Nevertheless, I do not think that the slightly different wording in claim 1 affects my conclusion.

Defendants have thus failed to show that the claims are indefinite. I construe "said FDB" in the instance where it is not followed by "of said first line card" to be "said FDB of said first line card."[15]

### 2. "virtual media access control (MAC) bridge" (claims 8, 11, 18)

   a. *Plaintiff's proposed construction*: not indefinite; alternatively, plain and ordinary meaning which is a media access control (MAC) bridge that serves a virtual private network (VPN) instance
   b. *Defendants' proposed construction*: indefinite
   c. *Court's construction*: not indefinite

Plaintiff argues that virtual MAC bridges were well-known at the relevant time, and a POSA would have understood the term's meaning in light of the claims and the specification. (D.I. 79 at 47–48). Citing to the specification, Plaintiff contends that the patent provides "various descriptions of virtual bridges and networks." (*Id.* at 50–51). For instance, the specification states, "Every node in a [virtual private LAN service (VPLS)] acts as a virtual bridge. A virtual bridge node has 'virtual ports,' which are the endpoints of [Ethernet "Pseudo-Wires"] that are part of the VPLS." (*Id.* at 50 (quoting '400 patent at 2:22–25)).[16]

Defendants argue the term is indefinite because the intrinsic record does not provide guidance as to the term's scope. (*Id.* at 48). Defendants disagree that the term has a well-understood meaning and argue that "it appears to be a coined term specific to this patent." (*Id.*).

---

[15] Defendants argue that such a construction would not make sense. I think that is a factual question about whether a single line card can be both the ingress and the egress at the same time. If that is an impossibility, I presume Defendants will raise that at summary judgment.

[16] Defendants argue that these citations to the specification are unhelpful because terms like VPLS and VPN are recited separately in the claims and have different meanings than the term at issue. (D.I. 79 at 52).

Defendants contend that the claim language, specification, and file history do not provide "any objective boundaries" regarding the term. (*Id.* at 48–49). They further contend that Plaintiff's proposed construction "simply recites a function of the 'virtual MAC bridge' without defining it." (*Id.* at 49). Such a construction, Defendants argue, would make the "wherein" clause of claim 8 redundant. (*Id.* at 52).

I do not think Defendants have shown that the term "virtual media access control (MAC) bridge" is indefinite. The specification is consistent with Plaintiff's argument that virtual MAC bridges were well-known at the relevant time. The specification states, "Multiple LANs can be connected together using MAC bridges, as set forth in the *IEEE Standard for Information Technology, Telecommunications and Information Exchange between Systems, Local and Metropolitan Area Networks, Common Specifications, Part 3: Media Access Control (MAC) Bridges* . . . ." ('400 patent at 1:19–25). The specification also states, "In some embodiments of the present invention, a network node comprises multiple line cards having respective ports, and is configured to operate as a virtual MAC bridge in a Layer 2 virtual private network (VPN)." (*Id.* at 3:3–6). Defendants' expert, Dr. Michalson, acknowledges that a POSA would have understood the meaning of a "MAC bridge." (D.I. 81-3 ¶ 56). I do not think that Dr. Michalson's opinion (*id.* ¶¶ 56–60) shows that a POSA would be unable to ascertain the meaning of "virtual MAC bridge" with reasonable certainty.

I agree with Defendants, however, that Plaintiff does not offer a proper construction for this term. Plaintiff's alternative construction only recites a function of the term. I thus conclude that the term is not indefinite, and I do not construe it further.

### 3.  order of steps (claims 1, 11)

      a. *Plaintiff's proposed construction*: not all limitations require an ordering; those that do are explicit in the claim language used; nothing in claim 1 requires 1[e] to

22

happen before 1[f] or before 1[g], nor 1[g] before 1[h]; claim 11 is not a method claim[17]

b. *Defendants' proposed construction*: the step of conveying the data packet to the first line card (1[e]) must be performed before the FDB [of the first line card] is checked (1[f]) and the source MAC address is checked (1[g]); and 1[g] must be performed before the record is added to the FDB (1[h])

c. *Court's construction*: no order required

The parties dispute whether the steps in claims 1 and 11 must follow a particular order.

The relevant steps in claim 1 state,

[1E] conveying, by transmitting said data packet to said MAC destination address via said first port, said received data packet in said network node to at least said first line card for transmission to said MAC destination address;
[1F] if said MAC destination address does not appear in said FDB, flooding said data packet via one and only one LAG port of said plurality of LAG ports;
[1G] checking said MAC source address of the data packet against records in said FDB of said first line card; and
[1H] if said FDB of said first line card does not contain a record of an association of said MAC source address with said ingress port, creating a new record of said association, adding said new record to the FDB of said first line card, and sending a message of the association to each member line card of said plurality of member line cards.

('400 patent at 11:16–30).

Plaintiff contends that steps [1E] through [1H] recite three different operations. (D.I. 79 at 53). Plaintiff argues that the flooding described in step [1F] may occur before step [1E], so Defendants' proposed construction is inconsistent with the claims and specification. (*Id.* at 54). Plaintiff further argues that the MAC source learning described in steps [1G] and [1H] could occur before step [1E], which describes the process of MAC destination forwarding. (*Id.*).

Defendants argue that claim 1 requires a logical order. (*Id.* at 55). Setting aside any indefiniteness issues, Defendants contend that if "said FDB" is "said FDB of the first line card," then step [1E] must come before step [1F] because "the data packet must first be conveyed to the

_____

[17] Plaintiff's briefing addresses whether step [1F] must occur before step [1H]. Defendants, however, argue that step [1G] occurs before step [1H], not that step [1F] occurs before step [1H]. I have edited Plaintiff's proposed construction accordingly.

first line card . . . before the data packet is checked in the FDB of the first line card." (*Id.* at 56–57). Defendants further argue that the FDB must be checked in step [1G] before one can know whether the FDB has a record of association of the ingress port and MAC source address. (*Id.* at 57). Defendants contend that the specification is consistent with their position and that claim 11 requires an order as well. (*Id.* at 57–58).

Plaintiff responds that it would be possible "to check the records of the first line card before conveying the data packet" if the first line card is both the ingress card and egress card. (*Id.* at 59–60). Plaintiff contends that an example in the specification illustrates this scenario, so Defendants' proposed construction would exclude a preferred embodiment. (*Id.* at 59). Plaintiff similarly contends that the MAC source address checking in step [1G] "could . . . occur as part of the ingress processing on the first line card when the first line card initially receives the packet." (*Id.* at 60). Plaintiff applies similar reasoning to claim 11. (*Id.* at 61).[18]

I agree with Plaintiff that step [1E] does not need to occur before step [1F]. Unlike the claims in the '369 patent, where certain steps clearly referred back to previous steps, the language in claims 1 and 11 of the '400 patent does not suggest that an order is required. The specification similarly does not indicate that an order is required. A description of one embodiment states,

> When an ingress line card receives an incoming data packet over the VPN on one of its ports, it consults the FDB in order to choose the line card and port through which the packet should be forwarded based on the MAC destination address (or floods the packet through the ports in the VPN when the MAC destination address does not appear in the FDB).

---

[18] Although "Defendants acknowledge that a line card could perform ingress and egress functionalities," Defendants argue that the patent does not disclose "a single packet coming into a line card, going into the switching core, and then coming back to the same line card such that the ingress and egress line cards for a single packet flow are one and the same." (D.I. 79 at 61–62).

('400 patent at 3:11–17). Elsewhere in the specification, a description of a figure states,

> If the record is found, the packet processor adds a tag to the packet indicating the
> egress port through which the packet should be forwarded, as well as the ingress
> port through which the packet was received. . . . When packet processor 52
> receives a packet on ingress path 54 for whose key there is no[t] a corresponding
> record in database 58, however, it tags the packet for flooding.

(*Id.* at 7:31–44). These portions of the specification are consistent with allowing steps [1E] and

[1F] to occur in either order.

I similarly do not think that the intrinsic record shows step [1E] must occur before step

[1G]. The process described in step [1E] focuses on the MAC destination address, while the

process described in step [1G] focuses on the MAC source address. The specification is

consistent with allowing these steps to occur in either order. (*See, e.g.*, *id.* at 3:11–24). I do not

think that the intrinsic record requires an order between steps [1G] and [1H] either.

I therefore reject Defendants' proposed construction for both claims 1 and 11. The steps

at issue do not need to occur in a particular order.

4. **"conveying . . . said received data packet . . . to at least said first line card for**
   **transmission to said MAC destination address / said ingress line card conveys said**
   **data packet . . . to at least said first line card for transmission to said MAC**
   **destination address" (claims 1, 11)**

   a. *Plaintiff's proposed construction*: claim 1: conveying, by transmitting said data
      packet to said MAC destination address via said first port, said received data
      packet in said network node to at least said first line card for transmission to said
      MAC destination address / claim 11: said ingress line card conveys said data
      packet via said switching core to at least said first line card for transmission to
      said MAC destination address
   b. *Defendants' proposed construction*: claim 1: conveying from a line card
      containing the ingress port . . . said received data packet . . . to at least said first
      line card for transmission to said MAC destination address / claim 11: said ingress
      line card containing an ingress port conveys said data packet via said switching
      core to at least said first line card for transmission to said MAC destination
      address
   c. *Court's construction*: no construction necessary

Plaintiff argues that this term does not require construction because a POSA would readily understand it. (D.I. 79 at 63). Plaintiff contends that Defendants' proposed construction "adds no additional clarity and serves only to make the claims verbose." (*Id.*).

Defendants argue their proposed construction clarifies that the data packet is conveyed from the ingress line card that contains the ingress port. (*Id.* at 64). Defendants also contend that their construction "resolves an antecedent basis issue for the claimed 'ingress port' that is introduced for the first time in claim 11's 'checking' limitation as 'said ingress port.'" (*Id.* at 65 n.13). Plaintiff responds that Defendants are attempting to improperly add a new limitation— "where the data packet is conveyed from." (*Id.* at 65).

I agree with Plaintiff that this term does not require construction. The surrounding language in claims 1 and 11 already indicates that "said received data packet" and "said data packet" refer to the data packet received on an ingress port. In claim 1, the limitation prior to the "conveying" term states, "receiving a data packet on an ingress port of said network node from a MAC source address . . . ." ('400 patent at 11:12–15). Claim 11 similarly states that line cards receive "a data packet on an ingress line card from a MAC source address . . . ." (*Id.* at 12:37–39). Claim 11 further states that "each line card ha[s] respective ports." (*Id.* at 12:31–33). I therefore think Defendants' proposed construction is unnecessary because claims 1 and 11 are already clear that the data packets are conveyed from line cards that correspond to ingress ports.

Although claim 11 lacks an explicit antecedent basis for "said ingress port," I think the term "nonetheless has a reasonably ascertainable meaning" when viewed in the context of the claims. *Energizer Holdings*, 435 F.3d at 1370. Claim 11 states that each line card has a respective port, and the claim recites an ingress line card. ('400 patent at 12:22–53). A POSA would have understood "said ingress port" as referring to the port of the ingress line card. I also

note that claim 1 recites "an ingress port" before reciting "said ingress port." (*Id.* at 10:65–11:30),

5. **"providing for each of said member line cards a respective forwarding database (FDB)" (claims 1, 11)**

   a. *Plaintiff's proposed construction*: no construction necessary; alternatively, plain and ordinary meaning which is providing for each of said member line cards a respective forwarding database (FDB)
   b. *Arista's proposed construction*: providing for each of said member line cards a single forwarding database (FDB)
   c. *Court's construction*: no construction necessary

Plaintiff argues this term does not require construction. (D.I. 79 at 66). Defendant Arista argues that "a respective forwarding database" should be construed to mean a single FDB. (*Id.* at 67). Dell Defendants do not take a position on this term. (*Id.* at 66 n.14).

Plaintiff contends a POSA would understand "respective" "to mean that each member line card is equipped with its own FDB." (*Id.* at 66). Plaintiff argues that each line card, however, is not limited to a single FDB. (*Id.*). Plaintiff contends that replacing "respective" with "single" would contradict the way "respective" is used elsewhere in the patent. (*Id.* at 66–67).

Arista argues there is no intrinsic support for a single line card having multiple FDBs. (*Id.* at 67). Arista contends that Plaintiff's proposed construction "introduces unanswered questions, such as how a line card would update multiple FDBs and how a line card would choose among multiple routing instructions." (*Id.*).

I agree with Plaintiff that this term does not require construction. The words "a" and "an" typically mean "one or more" in patent claims; a patentee must show a "clear intent" to limit these words to "one." *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance

carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'").  I do not think that Arista's citations to the specification (*see* D.I. 79 at 67–68) show a clear intent to limit "a respective forwarding database" to a single FDB.  I therefore reject Arista's proposed construction.

## V.   CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.